# **<u>Exhibit B</u>**

## LOAN AND SECURITY AGREEMENT

### $1,000,000.00 Commercial Credit Facility

**THIS LOAN AND SECURITY AGREEMENT** (as amended, modified or restated from time to time, this "Agreement") dated effective as of **MAY __, 2024** (the "Effective Date"), is between (a) **PRIMALEND CAPITAL PARTNERS, LP**, a Texas limited partnership (together with its successors and assigns, "Lender") and (b) **OHA PAPI, LLC**, a Texas limited liability company dba Simple Auto DFW ("Debtor").

### RECITALS

**WHEREAS**, Debtor has requested that Lender extend the Credit Facility to Debtor on the terms described in this Agreement.

**WHEREAS**, Lender is willing to make the Credit Facility available to Debtor upon and subject to the provisions, terms and conditions set forth in the Loan Documents.

**NOW THEREFORE**, the parties hereto, intending to be legally bound, agree as follows:

1.       **Definitions**.  As used in this Agreement, all exhibits, appendices and schedules hereto, and in any other Loan Documents made or delivered pursuant to this Agreement, the following terms will have the meanings given such terms in this Section 1 or in the provisions, sections or recitals herein:

"Advance" means any advance under the Credit Facility, which advance shall be part of the Loan.

"Advance Rate" means the advance rate, expressed as a percentage, against the amount of Qualified Collateral or Legacy Qualified Collateral, as set forth in Exhibit II.  The Advance Rate may be modified from time to time by Lender in its sole and absolute discretion.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Anti-Corruption Laws" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Obligor or any of its Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Obligor or any of its Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Blocked Account Agreement" shall mean that certain Deposit Account Control Agreement (Blocked Account with Delegation) among Lender, Debtor and CIBC Bank USA.

"Borrowing Base" means the sum of the principal balance or remaining lease payments (as applicable) of all Qualified Collateral and Legacy Qualified Collateral (excluding any interest, unearned rent and/or refundable security deposits, plus any required residual payments) multiplied by the Advance Rate.  The Borrowing Base may be modified from time to time by Lender in its sole discretion based on Lender's analysis of the performance of the Collateral and the likelihood of repayment under the Collateral.

"Business Day" means any day other than a Saturday, Sunday or any other day on which the Federal Reserve Bank of Dallas, Texas, is closed.

"Code" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of Texas; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different articles or divisions of the Code, the definition of such term

contained in Article 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Texas, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" means:

(a)     All Sales and Lease Contracts, including all Qualified Collateral and Legacy Qualified Collateral or Legacy Qualified Collateral.

(b)     Any property or asset, whether real or personal, pledged by a Grantor to secure the Indebtedness.

(c)     All present and future accounts, chattel paper (including electronic chattel paper), commercial tort claims, commodity accounts, commodity contracts, deposit accounts, documents, financial assets, general intangibles, health care insurance receivables, instruments, Intellectual Property, investment property, letters of credit, letter of credit rights, payment intangibles, securities, security accounts and security entitlements now or hereafter owned, held or acquired.

(d)     All present and hereafter acquired inventory (including without limitation, Motor Vehicles) and goods (including without limitation, all raw materials, work in process and finished goods) held, possessed, owned, held on consignment or held for sale, lease, return or to be furnished under contracts of services, in whole or in part, wherever located.

(e)     All equipment and fixtures of whatsoever kind and character now or hereafter possessed, held, acquired, leased or owned, together with all replacements, accessories, additions, substitutions and accessions to all of the foregoing, and all records relating in any way to the foregoing.

(f)     All books, records, data, plans, manuals, computer software, computer tapes, computer systems, computer disks, computer programs, source codes and object codes containing any information pertaining directly or indirectly to the Collateral and all rights to retrieve data and other information pertaining directly or indirectly to the Collateral from third parties.

The term "Collateral," as used herein, shall also include: (a) any other property or assets, real or personal, tangible or intangible, now existing or hereafter acquired, of any Obligor that may at any time be or become subject to a security interest or lien in favor of Lender as security for the Indebtedness; and (b) all **SUPPORTING OBLIGATIONS, PRODUCTS** and **PROCEEDS** of all of the foregoing (including without limitation, insurance payable by reason of loss or damage to the foregoing property) and any property, assets securities, guaranties or monies of Debtor which may at any time come into the possession of Lender. The designation of proceeds does not authorize Debtor to sell, transfer or otherwise convey any of the foregoing property except in the ordinary course of Debtor's business or as otherwise provided herein. For the avoidance of doubt, any personal property of Debtor which is not pledged to Lender as Collateral must be specifically set forth in Exhibit II.

"Compliance Certificate" means a certificate in the form attached hereto as Exhibit III.

"Constituent Documents" means (a) in the case of a corporation, its articles or certificate of incorporation and bylaws; (b) in the case of a general partnership, its partnership agreement; (c) in the case of a limited partnership, its certificate of limited partnership and partnership agreement; (d) in the case of a trust, its trust agreement; (e) in the case of a joint venture, its joint venture agreement; (f) in the case of a limited liability company, its articles of organization or certificate of formation and operating agreement or regulations; and (g) in the case of any other entity, its organizational and governance documents and agreements.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Facility" has the meaning stated in Section 2(a).

"Debt" means as to any Person at any time (without duplication) all items of indebtedness, obligation or liability of a Person, whether mature or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, that should be classified as liabilities in accordance with GAAP.

"Default" means any Event of Default or event which with notice and/or the passage of time would be an Event of Default.

"DMS" means a Dealer Management System set forth in Exhibit II.

"DMS Payment Reconciliation Report" means a report, substantially in the form of Exhibit VII attached hereto, executed by Debtor and used to reconcile (a) all individual Retail Customer checks, money orders, cash or electronic payments received and recorded in Debtor's and/or Servicer's DMS, as applicable, and (b) all deposits of each individual Retail Customers' checks, money order, cash or electronic payments as evidenced on the monthly bank statements for Debtor's Payment Account and Operating Account.

"Documented Reconditioning Costs" or "Make Ready Costs" means Debtor's direct costs to bring a vehicle into retail sales-ready condition, including the actual Dollar amount spent by Debtor on parts that are used on a specific vehicle, along with the labor to install those parts. This may include the actual direct costs of the GPS device and/or the starter interrupter device. Documented Reconditioning Costs and Make Ready Costs do not include any overhead expenses. Debtor shall timely enter all Documented Reconditioning Costs and Make Ready in its DMS. Debtor shall keep records and receipts of every item included as a Documented Reconditioning Cost or a Make Ready Cost, and Lender reserves the right to audit such records and receipts and exclude any items that are not properly documented or recorded.

"Dollars" and "$" mean lawful money of the United States of America.

"Event of Default" has the meaning stated in Section 13.

"GAAP" means generally accepted accounting principles, applied on a consistent basis, as set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question. Accounting principles are applied on a "consistent basis" when the accounting principles applied in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

"Good Floor" means **GOOD FLOOR LOANS LLC**, a Texas limited liability company.

"Good Floor Loan and Security Agreement" means that certain **LOAN AND SECURITY AGREEMENT** dated as of **MAY 15, 2024**, by and between Good Floor and Debtor.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GPS" means a global positioning system, starter interrupt or payment protection device.

"Grantor" means a Person that pledges assets to secure the Indebtedness, including but not limited to Debtor.

"Guarantor" means any Person, whether one or more, who from time to time guarantees all or any part of the Indebtedness.

"Guaranty" means a **GUARANTY AGREEMENT**, whether one or more, executed by Guarantor (as the same may be amended, restated or modified from time to time).

"Indebtedness" means (a) all indebtedness, obligations and liabilities of Debtor to Lender of any kind or character, now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several or joint and several, and regardless of whether such indebtedness, obligations and liabilities may, prior to their acquisition by Lender, be or have been payable to or in favor of a third party and subsequently acquired by Lender (it being contemplated that Lender may make such acquisitions from third parties), including without limitation all indebtedness, obligations and liabilities of Debtor to Lender now existing or hereafter arising under (i) the Note, this Agreement, the other Loan Documents or any draft, acceptance, guaranty, endorsement, letter of credit, assignment, purchase, overdraft, discount or indemnity agreement, or (ii) otherwise, (b) all accrued but unpaid interest on any of the indebtedness described in (a) above, (c) all obligations of Obligors to Lender under the Loan Documents, (d) all costs and expenses incurred by Lender in connection with the collection and administration of all or any part of the indebtedness and obligations described in (a), (b) and (c) above or the protection or preservation of, or realization upon, the collateral securing all or any part of such indebtedness and obligations, including without limitation all reasonable attorneys' fees and (e) all renewals, extensions, modifications and rearrangements of the indebtedness and obligations described in (a), (b), (c) and (d) above.

"Intellectual Property" means the copyrights, copyright licenses, patents, patent licenses, trademarks and trademark licenses now owned or hereafter acquired by Debtor.

"Legacy Qualified Collateral" means all Sales or Lease Contracts originated on vehicles purchased prior to the Effective Date which Debtor or Grantor pledges and Lender agrees to accept as Collateral. All payments received on, and/or any proceeds related to the Legacy Qualified Collateral, of any nature whatsoever, shall also serve as Legacy Qualified Collateral. Substitutes and replacements for Legacy Qualified Collateral shall not qualify as Legacy Qualified Collateral but may qualify as Qualified Collateral to the extent meeting the requirements set forth in the definition of Qualified Collateral. In order for Sales or Lease Contracts and accompanying Motor Vehicle titles to serve as Legacy Qualified Collateral they must comply with the terms and conditions stated in Exhibit I, provided, that certain Sales or Lease Contracts which do not comply with such terms and conditions may be considered Legacy Qualified Collateral if expressly set forth in Exhibit II, provided however that the occurrence of any of the following shall cause a Sales or Lease Contract to be disqualified from being Legacy Qualified Collateral:

(a)    The Retail Customer of Debtor or Grantor under any Sales or Lease Contract shall default in any material obligations to be performed by such Retail Customer under the Sales or Lease Contract;

(b)    Any representation set forth herein with respect to any Sales or Lease Contract shall prove to be false in any material respect;

(c)    Any loss, theft, substantial damage or destruction or theft of, with respect to the Motor Vehicle securing a Sales or Lease Contract, shall occur or any lien, levy or other encumbrance should attach thereto;

(d)    Lender is unable to contact a Retail Customer of Debtor or Grantor under any Sales or Lease Contract; or

(e)    Lender is unable to verify the payment history recorded in the DMS for a Retail Customer of Debtor or Grantor under any Sales or Lease Contract.

"Lender Group" means, collectively, Lender and any of its representatives, agents, employees, officers or directors, partners, members, and managers, and any Affiliate or entity in privity with Lender.

"Loan Documents" means this Agreement, the Note, the Guaranty, and the other agreements, instruments and documents evidencing, securing, governing, guaranteeing or pertaining to the Loans, executed by any Obligor or otherwise.

"Loans" means all Advances under the Credit Facility from time to time.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, property, operations, condition (financial or otherwise) or prospects of an Obligor (individually or taken as a whole), (b) the ability of an Obligor to pay or perform the Indebtedness, (c) any of the rights of or benefits available to Lender under the Loan Documents or (d) the validity or enforceability of the Loan Documents.

"Maximum Amount" means the maximum principal amount of the Loans that Lender will advance to Debtor hereunder, as stated in Exhibit II.

"Motor Vehicle(s)" means a passenger automobile, van, or light-duty truck, which can be registered for private use on public highways, and which is not (i) manufactured for a particular commercial purpose; (ii) a motorcycle (or similar vehicle); (iii) a motor home; or (iv) any other non-standard passenger motor vehicle as determined in Lender's reasonable discretion.

"Note" means, collectively, any promissory note evidencing all or part of the Indebtedness from time to time (as any such Note may be amended, modified or restated from time to time).

"Obligor(s)" means Debtor, Guarantor, Grantor or any other Person who guaranteed the Indebtedness, has pledged assets securing the Indebtedness, or is otherwise obligated to pay or perform all or any portion of Indebtedness.

"Operating Account(s)" means one or more deposit accounts in Debtor's name that Debtor uses for the operation of its business on all of which Lender will be an authorized signatory, and for which Debtor will provide to Lender read-only access and send Lender a monthly bank statement within **TEN (10)** days of Debtor's receipt of such statements.

"Overadvance" has the meaning stated in Section 2(a).

"Payment Account" means a deposit account in Debtor's name subject to an Blocked Account Agreement providing Lender's control over such account into which Debtor shall make a daily deposit of all related revenues and payments received from Retail Customer payments on Pledged Accounts, including but not limited to, principal, interest, lease payments, full payoffs, partial payoffs and insurance proceeds on Pledged Accounts, excluding any revenues received as down payments, security payments and service payments into such deposit account. The approved bank for the Payment Account is set forth in Exhibit II.

"Permitted Debt" has the meaning stated in Section 8(c).

"Permitted Encumbrances" means the following encumbrances: (a) liens for taxes, assessments or governmental charges or levies not yet due and payable or liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP; (b) liens in respect of property of a Person imposed by law which were incurred in the ordinary course of business and which have not arisen to secure Debt for borrowed money, such as carriers', materialmen's, warehousemen's and mechanics' liens, statutory and common law landlord's liens, and other similar liens arising in the ordinary course of business, and which either (i) do not in the aggregate materially detract from the value of such property or materially impair the use thereof in the operation of the business of a Person, or (ii) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property subject to such lien; (c) liens created by or pursuant to: (i) the Loan Documents, (ii) the Good Floor Loan and Security Agreement; and (iii) the Loan Documents as defined in the Good Floor Loan and Security Agreement; (d) liens permitted as stated on Exhibit II or liens permitted for Permitted Debt specified in Section 8(c)(iii); (e) liens created pursuant to or in connection with capital leases permitted pursuant to this Agreement,

LOAN AND SECURITY AGREEMENT – PAGE 5
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

provided that (i) such liens only serve to secure the payment of rent or Debt arising under such capital leases, and (ii) the liens encumbering the assets leased or purported to be leased under such capital leases do not encumber any other assets of a Person; and (f) liens in equipment and fixtures arising pursuant to purchase money security interests securing Debt representing the purchase price of assets acquired after the Effective Date; provided that (i) any such liens attach only to the assets so purchased, upgrades thereon and, if the asset so purchased is an upgrade, the original asset itself (and such other assets financed by the same financing source), (ii) the Debt secured by any such lien does not exceed the purchase price of the property being purchased at the time of the incurrence of such Debt, and (iii) the Debt secured thereby is permitted to be incurred pursuant to this Agreement.

"Permitted Reinsurance Companies" shall have the meaning stated in Section 7(d).

"Person" means any individual, corporation, limited liability company, business trust, association, company, partnership, joint venture, Governmental Authority, or other entity, and shall include such Person's heirs, administrators, personal representatives, executors, successors and assigns.

"Pledged Accounts" means all Sales or Lease Contracts where Debtor has given Lender physical possession of the original Sales or Lease Contract or a certified copy of the Sales or Lease Contract, and Debtor has manifested an intention to Lender to pledge said Sales or Lease Contract to Lender through an assignment stamp or other means.

"Principal-Balance Weighted Average Payment Term" means the sum of the following calculation for each piece of Qualified Collateral or Legacy Qualified Collateral: the payment term at origination multiplied by the remaining principal balance of the same Sales or Lease Contract divided by the sum of the remaining principal balance for all Qualified Collateral and Legacy Qualified Collateral. For example, if there is a contract (a) with a term at origination of 36 months and a remaining principal balance of $10,000 and a contract (b) with a term of 24 months and a remaining principal balance of $5,000 then the Principal-Balance Weighted Average Payment Term is the following: 36 * $10,000 / $15,000 + 24 * $5,000 / $15,000 = 32. The Principal-Balance Weighted Average Payment Term of this pool of two contracts is 32 months.

"Qualified Collateral" means all Sales or Lease Contracts, including accompanying Motor Vehicle titles, lien releases, collateral files and underlying Motor Vehicles sold and/or financed or leased by Debtor or Grantor securing the Sales or Lease Contracts which Debtor or Grantor pledges and Lender agrees to accept as Collateral. All substitutes and replacements for, payments received on, and/or any proceeds related to the Qualified Collateral, of any nature whatsoever, shall also serve as Qualified Collateral. In order for Sales or Lease Contracts and accompanying Motor Vehicle titles to serve as Qualified Collateral they must comply with the terms and conditions stated in Exhibit I, provided, that certain Sales or Lease Contracts which do not comply with such terms and conditions may be considered Qualified Collateral if expressly set forth in Exhibit II, provided however that the occurrence of any of the following shall cause a Sales or Lease Contract to be disqualified from being Qualified Collateral:

     (a)     The Retail Customer of Debtor or Grantor under any Sales or Lease Contract shall default in any material obligations to be performed by such Retail Customer under the Sales or Lease Contract;

     (b)     Any representation set forth herein with respect to any Sales or Lease Contract shall prove to be false in any material respect;

     (c)     Any loss, theft, substantial damage or destruction or theft of, with respect to the Motor Vehicle securing a Sales or Lease Contract, shall occur or any lien, levy or other encumbrance should attach thereto;

     (d)     Lender is unable to contact a Retail Customer of Debtor or Grantor under any Sales or Lease Contract; or

     (e)     Lender is unable to verify the payment history recorded in the DMS for a Retail Customer of Debtor or Grantor under any Sales or Lease Contract.

"Repossessed Vehicle(s)" means Motor Vehicle(s) that are owned by Debtor after Debtor took physical and legal possession of the Motor Vehicle from a Retail Customer after the Retail Customer defaulted on the terms of the Sales or Lease Contract.

"Retail Customer" means a customer of Debtor under a Sales or Lease Contract.

"Sales or Lease Contract(s)" means Motor Vehicle Retail Installment Sales Contracts or Motor Vehicle Leases entered into by Debtor or Grantor from time to time, "Sales Contract(s)" means Motor Vehicle Retail Installment Sales Contracts entered into by Debtor or Grantor from time to time, and "Lease Contract(s)" means Motor Vehicle Leases entered into by Debtor or Grantor from time to time.

"Sanctioned Country" means at any time, a country, region or territory which is itself (or whose government is) the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including OFAC's Specially Designated Nationals and Blocked Persons List and OFAC's Consolidated Non-SDN List), the U.S. Department of State, or other relevant sanctions authority, (b) any Person organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any such Person or Persons described in clauses (a) and (b), including a Person that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Person(s), or (d) any Person otherwise a target of Sanctions.

"Sanctions" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State) or other relevant sanctions authority in any jurisdiction (a) in which any Obligor or any of its Affiliates is located or conducts business, (b) in which any of the proceeds of any extensions of credit hereunder will be used, or (c) from which repayment of any extensions of credit hereunder will be derived.

All words and phrases used herein shall have the meaning specified in the Code except to the extent such meaning is inconsistent with this Agreement. All definitions contained in this Agreement are equally applicable to the singular and plural forms of the terms defined. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "including" shall mean "including, but not limited to". Any accounting term used in the Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP consistently applied; provided, that all financial covenants and calculations in the Loan Documents shall be made in accordance with GAAP as in effect on the Effective Date unless Debtor and Lender shall otherwise specifically agree in writing. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

2.     **Credit Facility**.

(a)     **Revolving Credit Facility**. Subject to the terms and conditions set forth in this Agreement and the other Loan Documents, Lender hereby agrees to make Loans to Debtor under a credit facility (the "Credit Facility") in an aggregate sum not to exceed the lesser of: (i) an amount equal to the Borrowing Base; or (ii) the Maximum Amount (less any required reserves), on a revolving basis from time to time during the period commencing on the Effective Date and continuing until the earliest of: (i) the acceleration of the Indebtedness pursuant to the terms of the Loan Documents; or (ii) the Maturity Date set forth in Exhibit II. If at any time the sum of the aggregate principal amount of Loans outstanding hereunder exceeds either the Maximum Amount (less any required reserves) or the Borrowing Base, such amount shall be deemed an "Overadvance". At any time there is an Overadvance and for so long as such Overadvance remains unpaid, the Rate (as defined in the Note) on the unpaid principal balance of the Note may be increased without advance notice to Debtor at Lender's discretion up to the lesser of (i) **18.00%**, or (ii) the **MAXIMUM RATE** (as defined in the Note). Debtor shall repay the amount of such Overadvance plus all accrued and unpaid interest thereon within **THREE (3)** Business Days written demand from Lender. If an Overadvance exists,

and is not cured within **THREE (3)** Business Days as noted in this Section, Lender is authorized to automatically debit from the Payment Account or the Operating Account, at any time and without prior notice, any amount necessary to cure the Overadvance. Notwithstanding anything contained herein to the contrary, an Overadvance shall be considered a Loan and shall bear interest at the interest rates set forth in the Note evidencing the Credit Facility and be secured by this Agreement. Subject to the terms and conditions hereof, Debtor may borrow, repay and reborrow funds under the Credit Facility.

(b)  **Funding**. The initial Loan under the Credit Facility shall not be in an amount less than the "Initial Minimum Loan Amount" stated in Exhibit II. Debtor shall provide Lender not less than **THREE (3)** Business Days prior notice of its request for a Loan under the Credit Facility, specifying the aggregate amount of such Loan together with an advance request in the form set forth in Exhibit IV, and together with any documentation relating thereto as Lender may reasonably request, including, but not limited to, DMS updates, supporting schedules or other Borrowing Base related materials. Nothing contained herein shall obligate Lender to honor more than **ONE (1)** Advance per week. Debtor shall give Lender notice of each Loan under the Credit Facility by no later than 1:00 p.m. (Plano, Texas time). Lender shall have no liability to Debtor for any loss or damage suffered by Debtor as a result of Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it by facsimile or electronically and purporting to have been sent to Lender by Debtor and Lender shall have no duty to verify the origin of any such communication or the identity or authority of the Person sending it. Subject to the terms and conditions of this Agreement, each Loan under this section shall be made available to Debtor by depositing the same, in immediately available funds, in an account of Debtor designated by Debtor or by paying the proceeds of such Loan to a third party designated by Debtor. Debtor authorizes Lender to make Advances directly to third party creditors of Debtor that Lender deems necessary, in Lender's sole and absolute discretion, to protect the Collateral or to allow Debtor to continue as an ongoing concern.

(c)  **Loan Payment**. On a weekly basis, Lender may invoice (via email) Debtor and, immediately after such invoice is sent, Lender shall be authorized to automatically debit the Payment Account or the Operating Account to pay the interest on the Loans and any other amounts owing from Debtor.

(d)  **Use of Proceeds**. The Loans under the Credit Facility shall be used by Debtor for working capital in the ordinary course of business, and for such capital expenditures, dividends and distributions as are permitted by this Agreement.

(e)  **Joint and Several Liability**. Each Debtor and any other Person named or identified as Debtor under the Loan Documents from time to time hereby irrevocably and unconditionally: (i) agree that each is **JOINTLY** and **SEVERALLY** liable to Lender for the full and prompt payment and performance of the Indebtedness under the Loan Documents in accordance with the terms thereof; (ii) agree to fully and promptly perform all of their obligations hereunder and the other Loan Documents with respect to each Advance hereunder as if such Advance had been made directly to it; and (iii) agree as a primary obligation to indemnify Lender on demand for and against any loss incurred by Lender as a result of any of the Indebtedness being or becoming void, voidable, unenforceable or ineffective for any reason whatsoever, whether or not known to Lender or any person, the amount of such loss being the amount which Lender would otherwise have been entitled to recover from any one or more of Debtor and other Person named as Debtor under the Loan Documents from time to time.

(f)  **Fees**. Debtor agrees to pay to Lender:

(i)  **Origination Fee**. Origination fees as set forth in Exhibit II for the establishment of the Credit Facility. The origination fees shall compensate Lender for its costs and expenses in the structuring of the Credit Facility and (to the maximum extent permitted by applicable law) shall not be deemed interest.

(ii)  **Collateral Processing Fee**. A collateral processing fee as set forth in Exhibit II on each Sales or Lease Contract and associated underlying Motor Vehicle Title Application which is presented to Lender for consideration to use as Qualified Collateral and Legacy Qualified Collateral.

(iii) **Unused Line Fee**. An unused line fee on the daily average unused amount of the Credit Facility for the period from and including the Effective Date to and including the Maturity Date at the rate set forth in Exhibit II based on a **THREE HUNDRED SIXTY (360)** day year and the actual number of days elapsed. For the purpose of calculating the facility fee hereunder, the Credit Facility shall be deemed used by the amount of all outstanding Loans under the Credit Facility. The accrued facility fee shall be payable in arrears on the **FIRST (1st)** Business Day of each week and on the Maturity Date.

(iv) **Amendment Fee**. Amendment fees as set forth in Exhibit II for any amendments to the Credit Facility. The amendment fees shall compensate Lender for its costs and expenses in modifying the Credit Facility and (to the maximum extent permitted by applicable law) shall not be deemed interest.

(g) **Termination Fee; Prepayment**. Upon **THIRTY (30)** days' notice to Lender, Debtor may terminate the Credit Facility and prepay the Loans in full with no prepayment penalty. Upon less than **THIRTY (30)** days' notice to Lender and payment of the termination fee stated in Exhibit II, Debtor may terminate the Credit Facility and prepay the Loans in full. It is contemplated that by reason of prepayments hereunder there may be times when the outstanding principal balance of the Credit Facility is reduced to **ZERO ($0)**, but notwithstanding such occurrence, this Agreement shall remain valid and be in full force and effect, and no termination fee shall be due and owing unless the Credit Facility has been terminated.

(h) **Real Property or Ancillary Loans**. Lender may make loans against real property owned by an Obligor and pledged to Lender to secure the Indebtedness, or loans which may be unsecured or secured by specific items of personal and/or real property. In connection therewith, such Obligor shall execute and deliver such Loan Documents and other instruments and documents as Lender shall require. Any such real property and ancillary loans are stated in Exhibit II.

3. **Note, Rate and Computation of Interest**. The Credit Facility shall be evidenced by a Note duly executed by Debtor and payable to the order of Lender, in form and substance acceptable to Lender. Interest on the Note shall accrue at the rates set forth therein. The principal of and interest on the Note shall be due and payable in accordance with the terms and conditions set forth in the Note and in this Agreement. All payments made by Debtor under this Agreement and the other Loan Documents shall be made to Lender at Lender's offices as set forth herein in Dollars and immediately available funds, without setoff, deduction or counterclaim, and free and clear of all taxes, at the time and in the manner provided in the Note. At Lender's request, Debtor shall execute subsequently to the Effective Date additional Notes which evidence specific Advances under the Credit Facility.

4. **Collateral**.

(a) **Grant of Security Interest**. As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Indebtedness, each of Debtor and Grantor hereby pledges to and grants Lender, a security interest in, all of Debtor's and Grantor's right, title and interest in the Collateral, whether now owned by Debtor or Grantor or hereafter acquired and whether now existing or hereafter coming into existence. If the security interest granted hereby in any rights of Debtor or Grantor under any contract or other agreement included in the Collateral is expressly prohibited by such contract, then the security interest hereby granted therein nonetheless remains effective to the extent allowed by Article 9 of the Code or other applicable law but is otherwise limited by that prohibition.

(b) **Commercial Tort Claim**. If Debtor or Grantor at any time holds or acquires a commercial tort claim, such Person shall notify Lender in writing within **FIVE (5)** Business Days of such occurrence with the details thereof and grant to Lender a security interest therein or lien thereon and in the proceeds thereof, in form and substance satisfactory to Lender.

(c) **Debtor and Grantor Remain Liable**. Notwithstanding anything to the contrary contained herein: (i) each of Debtor and Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Lender of any of its rights hereunder shall not release Debtor or Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral; and (iii) Lender shall not have any obligation or liability under any of

LOAN AND SECURITY AGREEMENT – PAGE 9
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Debtor or Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(d)     **Intellectual Property**.  Each of Debtor and Grantor owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license could not reasonably be expected to have a Material Adverse Effect.  Each of Debtor and Grantor will maintain the patenting and registration of all Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or other appropriate Governmental Authority, and Debtor will promptly patent or register, as the case may be, all new Intellectual Property and notify Lender in writing **FIVE (5)** Business Days prior to filing any such new patent or registration.

(e)     **Additional Documents**.  To secure full and complete payment and performance of the Indebtedness, each of Debtor and Grantor shall execute and deliver or cause to be executed and delivered all of the Loan Documents reasonably required by Lender covering the Collateral.  Each of Debtor and Grantor shall execute and cause to be executed such further documents and instruments, as Lender, in its reasonable discretion, deems necessary or desirable to create, evidence, preserve and perfect its liens and security interests in the Collateral, including (without limitation) stamping or taking like action with respect to any Sales or Lease Contracts as may be required by Lender.  In the event any of the Loan Documents evidencing or securing the Indebtedness misrepresents or inaccurately reflects the correct terms and/or provisions of the Indebtedness, each Obligor shall upon request by Lender and in order to correct such mistake, execute such new documents or initial corrected, original documents as Lender may deem reasonably necessary to remedy said errors or mistakes.  Each Obligor shall execute such other documents as Lender shall deem reasonably necessary to correct any defects or deficiencies in the Loan Documents.  Any Obligor's failure to execute such documents as requested shall constitute an Event of Default under this Agreement.

(f)     **Setoff**.  As further security for the Indebtedness, each Obligor grants to Lender a first lien and contractual right of set-off in and to all money and property of Obligor now or at any time hereafter coming within the custody or control of Lender, including (without limitation) all certificates of deposit and other accounts, whether such certificates of deposit and/or accounts have matured or not, and whether the exercise of such right of set-off results in loss of interest or other penalty under the terms of the certificate of deposit or account agreement.  It is further agreed that Lender shall have a first lien on all deposits and other sums at any time credited by or due from Lender to Obligor as security for the payment of the Indebtedness, and Lender, at its option after the occurrence of a Default may without notice and without any liability, hold all or any part of any such deposits or other sums until all amounts owing under the Loan Documents have been paid in full, and/or Lender may apply or set-off all or any part of any such deposits or other sums credited by or due from Lender to or against any sums due under the Loan Documents in any manner and in any order of preference which Lender, in its sole discretion, chooses.  The rights and remedies of Lender hereunder are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may have.

(g)     **Satisfaction of Indebtedness**.  Until the Indebtedness has been indefeasibly paid and fully satisfied (other than contingent indemnification obligations to the extent no unsatisfied claim has been asserted) and the commitments of Lender under the Credit Facility have been terminated, Lender shall be entitled to retain the security interests in the Collateral granted under the Loan Documents and the ability to exercise all rights and remedies available to Lender under the Loan Documents and applicable laws.

5.     **Conditions Precedent**.  The obligation of Lender to make any Loan shall be subject to the following conditions precedent:

(a)     **Request for Advance**.  Lender shall have received in accordance with this Agreement, a request for advance as set forth in Exhibit IV, as further set forth in Section 2(b).

LOAN AND SECURITY AGREEMENT – PAGE 10
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

(b)    **Authorized Signatory**. Debtor shall have caused the depository bank holding the Operating Account to deliver to Lender documents sufficient to cause Lender to become an authorized signatory on the Operating Account to be exercised in an Event of Default.

(c)    **Credit and Background Checks**. Lender shall have performed credit and background checks in connection with this Agreement on all of the Obligors.

(d)    **Tri-Party Agreement**. Debtor shall enter into a tri-party agreement with Lender and Debtor's DMS provider and with Lender and Debtor's GPS provider, which allow Lender unrestricted access to Debtor's DMS and GPS data for as long as Debtor has any outstanding obligations to Lender. Debtor will cause its DMS provider and GPS provider to deliver Lender with any and all information contained in Debtor's DMS and GPS as requested by Lender, including, without limitation, a breakdown of the principal and interest Debtor receives from its DMS provider.

(e)    **Licenses and Registrations**. Lender shall have received evidence that Debtor has a current "General Distinguishing Number," or similar number, if applicable, from the applicable state department governing Sales or Lease Contracts and an active "Dealers Sales Finance License" or similar license in good standing issued by the applicable state Office of Consumer Credit Commission, or any other applicable state agency, and any and all other licenses or registrations that may be required by any federal, state or local jurisdiction.

(f)    **Fees and Expenses**. Lender shall have received evidence of, or be satisfied that, the costs and expenses of Lender (including reasonable attorneys' fees) and all fees owing to Lender, shall have been paid, or will be paid, in full by Debtor.

(g)    **No Default, Etc**. No Default or event which Lender believes could have a Material Adverse Effect shall have occurred and be continuing, or would result from or after giving effect to such Loan.

(h)    **Representations and Warranties**. All of the representations and warranties contained in the Loan Documents shall be true and correct in material respects on and as of the date of such Loan with the same force and effect as if such representations and warranties had been made on and as of such date.

(i)    **Waivers and Consents Relating to Real Property Interests**. Debtor shall cause each mortgagee of real property owned by Debtor and each landlord of real property leased by Debtor to execute and deliver agreements satisfactory in form and substance to Lender by which such mortgagee or landlord (i) waives or subordinates any rights it may have in the Collateral, or (ii) consents to the mortgage or other encumbrance of Debtor's interest in such real property. With respect to landlords, the form attached hereto as Exhibit VIII shall be satisfactory to Lender.

(j)    **Other Matters**. Such other documents and agreements as may be required by Lender in its reasonable discretion.

6.    **Representations and Warranties**. Each Obligor hereby represents and warrants, and upon each request for a Loan represents and warrants to Lender as follows:

(a)    **Existence**. Each Obligor that is not a natural person: (i) is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization; (ii) has all requisite power and authority to own its assets and carry on its business as now being or as proposed to be conducted; and (iii) is qualified to do business in all jurisdictions in which the nature of its business makes such qualification necessary and where failure to so qualify would have a Material Adverse Effect. Each Obligor has the power and authority to execute, deliver, and perform its obligations under the Loan Documents to which it is or may become a party.

(b) **Binding Obligations**. The execution, delivery, and performance of the Loan Documents by each Obligor have been duly authorized by all necessary action by such Obligor, and constitute legal, valid and binding obligations of such Obligor, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights and except to the extent specific remedies may generally be limited by equitable principles.

(c) **No Consent**. The execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated thereby, do not: (i) conflict with, result in a violation of, or constitute a default under (1) any provision of the Constituent Documents (if any) or other instrument binding upon any Obligor, (2) any law, governmental regulation, court decree or order applicable to any Obligor, or (3) any contractual obligation, agreement, judgment, license, order or permit applicable to or binding upon any Obligor; (ii) require the consent, approval or authorization of any third party; or (iii) result in or require the creation of any lien, charge or encumbrance upon any property or asset of any Obligor except as may be expressly contemplated in the Loan Documents.

(d) **Financial Condition**. Each financial statement of each Obligor supplied to Lender truly discloses and fairly presents such Person's financial condition as of the date of each such statement. There has been no material adverse change in such financial condition or results of operations of any Obligor subsequent to the date of the most recent financial statement supplied to Lender.

(e) **Operation of Business**. Each of Debtor and Grantor possesses all contracts, licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, necessary to conduct its businesses substantially as now conducted and as presently proposed to be conducted, and each of Debtor and Grantor is not in violation of any valid rights of others with respect to any of the foregoing, except any violations that could not reasonably be expected to have a Material Adverse Effect.

(f) **Litigation and Judgments**. Except as stated in Exhibit II, there is no action, suit, investigation, or proceeding before or by any Governmental Authority or arbitrator pending, or to the knowledge of any Obligor, threatened against or affecting such Obligor that would, if adversely determined, have a Material Adverse Effect. There are no outstanding judgments against any Obligor.

(g) **Criminal Charges**. Neither Debtor nor any of Debtor's principals: (i) has been in prison; (ii) has been convicted of any felony or other criminal action; or (iii) is under any current criminal investigation by any governmental agency, and neither Debtor nor any of Debtor's principals has any pending criminal charge, indictment or any other criminal action, other than a routine traffic violation, pending against them.

(h) **Rights in Properties; Liens**. Each of Debtor and Grantor has good and indefeasible title to or valid leasehold interests in its properties, including the properties and assets reflected in the financial statements provided to Lender, and none of the properties of Debtor or Grantor is subject to any lien, except Permitted Encumbrances.

(i) **Debt**. Debtor and Guarantor have no Debt other than the Permitted Debt.

(j) **Disclosure**. No statement, information, report, representation, or warranty made by any Obligor in the Loan Documents or furnished to Lender in connection with the Loan Documents or any of the transactions contemplated hereby contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to any Obligor which could reasonably be expected to have a Material Adverse Effect that has not been disclosed in writing to Lender.

(k) **Agreements**. Debtor is not a party to any indenture, loan, or credit agreement, or to any lease or other agreement or instrument, or subject to any charter or corporate or other organizational restriction which could reasonably be expected to have a Material Adverse Effect. Debtor is not in default

in any material respect in the performance, observance, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument material to its business.

(l) **Compliance with Laws; Sanctions**. No Obligor (a) is in violation of any law, rule, regulation, order, or decree of any Governmental Authority or arbitrator, the violation of which could reasonably be expected to have a Material Adverse Effect; and (b) is in violation of, and to the knowledge of each such Obligor, no director, officer, employee, agent or affiliate of such Obligor is in violation of, any applicable Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions, including, without limitation, those Sanctions administered and enforced by The Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"). No Obligor nor *any of its Affiliates* (i) is a Sanctioned Person, (ii) has its assets located in a Sanctioned Country that would be prohibited by Sanctions, or (iii) derives revenues from investments in, or transactions with, Sanctioned Persons. Each Obligor has implemented and maintains in effect policies and procedures designed to ensure compliance with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. The proceeds of any extension of credit made hereunder will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including Lender or any Affiliate thereof).

(m) **Taxes; Governmental Charges**. Each Obligor has filed all federal, state and local tax reports and returns required by any law or regulation to be filed by it and has either duly paid all taxes, duties and charges indicated due on the basis of such returns and reports, or made adequate provision for the payment thereof, and the assessment of any material amount of additional taxes in excess of those paid and reported is not reasonably expected. No Obligor has knowledge of any pending investigation of such Obligor by any taxing authority or any pending but unassessed tax liability.

(n) **Use of Proceeds; Margin Securities**. Debtor is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of regulations of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock. No part of the proceeds of any Loan will be used, directly or indirectly, (i) to make any payments to a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person**, *or (ii)** in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or Anti-Money Laundering Laws.

(o) **Security Interest**. Each of Debtor and Grantor has and will have at all times full right, power and authority to grant a security interest in the Collateral to Lender in the manner provided herein, free and clear of any lien, security interest or other charge or encumbrance other than for the Permitted Encumbrances. This Agreement creates a legal, valid and binding first priority security interest (subject to Permitted Encumbrances) in favor of Lender in the Collateral securing the Indebtedness. Possession by Lender of certain types of Collateral from time to time or the filing of the financing statements delivered prior hereto or concurrently herewith will perfect and establish the first priority of Lender's security interest hereunder in the Collateral (to the extent that perfection can be accomplished through the filing of a financing statement or the possession of such Collateral) other than for the Permitted Encumbrances.

(p) **Sales and Lease Contracts**. With respect to each Sales or Lease Contract:

(i) The Sales or Lease Contract complies with all laws, regulations and orders, federal or state, including all consumer protection laws and regulations, including, without limitation, the Truth in Lending Act, the Equal Credit Opportunity Act, and all applicable Unfair and Deceptive Practices Acts;

(ii)     The Sales or Lease Contract is genuine, valid and enforceable according to all terms and provisions thereof and is secured by a first and prior security interest in the Motor Vehicle, the description of which is, in all respects, true and complete;

(iii)     No uncured default on the part of the Retail Customer of Debtor or Grantor in any Sales or Lease Contract that is presented as Qualified Collateral or Legacy Qualified Collateral has occurred or is anticipated to occur and no offset, counterclaim or other defense exists or shall be permitted to arise in favor of the Retail Customer of Debtor or Grantor under the Sales or Lease Contract;

(iv)     The Retail Customers of Debtor or Grantor named in all such Sales or Lease Contracts are bonafide and have legal capacity to make such Sales or Lease Contracts and the down payment or deferred down payment, if any, represented as having been made by the Retail Customer of Debtor or Grantor in the Sales or Lease Contract has been made in cash, no part of which was loaned, directly or indirectly, by Debtor, Grantor or Guarantor to the Retail Customer of Debtor or Grantor;

(v)     A pledge of Collateral to Lender in the Sales or Lease Contract shall not impose upon Lender any of the obligations of Debtor or Grantor under the Sales or Lease Contract;

(vi)     Debtor and Grantor are in compliance with all federal, state or local laws and regulations, including but not limited to, the "Red Flag Rule", the applicable state "General Distinguishing Number" or similar number, the applicable state "Motor Vehicle Sales Finance License" or similar license, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and the Gramm-Leach-Bliley Act; and

(vii)     All Sales or Lease Contracts and related Collateral which serve as Qualified Collateral or Legacy Qualified Collateral comply with and meet all requirements contained in Exhibit I.

7.     **Affirmative Covenants**.  Until all Indebtedness is indefeasibly paid or performed, and Lender has no further commitment to lend under the Credit Facility, each Obligor agrees and covenants as follows:

(a)     **Payment of Obligations**.  Debtor will pay its obligations, including tax liabilities, that, if not paid, could become a lien on any of its property, before the same shall become delinquent or in default, except where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (ii) Debtor has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

(b)     **Maintenance and Conduct of Business**.  Debtor will: (i) keep, maintain and preserve all property (tangible and intangible) material to the conduct of its business in good working order and condition, ordinary wear and tear excepted; (ii) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, agreements and franchises material to the conduct of its business; and (iii) engage in an efficient and economical manner in a business of the same general type and within Debtor's powers under Constituent Documents.

(c)     **Books and Records; Inspection Rights**.  Debtor will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Debtor will permit any representatives designated by Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

(d)     **Insurance**.  Debtor will maintain insurance deemed reasonably necessary by Lender. Each policy of insurance maintained by Debtor shall: (i) name Debtor and Lender as insured parties thereunder (without any representation or warranty by or obligation upon Lender) as their interests may appear; (ii) contain the agreement by the insurer that any loss thereunder shall be payable to Lender notwithstanding any action, inaction or breach of representation or warranty by Debtor; and (iii) provide prior written notice of cancellation or of lapse shall be given to Lender by the insurer in accordance with the insurer's commercial practices as adopted from time to time.  Debtor will deliver to Lender original or duplicate policies of such

insurance. Debtor will also, at the request of Lender, duly execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment. In addition, Debtor will comply with all requirements and covenants set forth in applicable reinsurance agreements in all material respects. For as long as any Loans are outstanding, the Debtor shall purchase reinsurance only from (1) reinsurers with a minimum financial strength rating (as of the effective date of the relevant reinsurance agreement) of "A-" by A.M. Best Company or a minimum credit rating of "A-" by S&P, or (2) reinsurers approved by Lender and which have executed a Guaranty and other security documents as may be reasonably required by Lender (collectively, "Permitted Reinsurance Companies").

(e)      **Insurance--Collateral**.  Debtor shall obtain a copy of the proof of insurance, evidencing both comprehensive and collision property damage insurance coverage with deductibles not to exceed the amount stated in Exhibit I, from Debtor or Retail Customer of Debtor at the time of the sale or lease of the Motor Vehicle to such Retail Customer and prior to the Retail Customer of Debtor removing the Motor Vehicle from Debtor's premises.  Debtor shall also use commercially reasonable efforts to insure that Debtor or Retail Customers of Debtor under the Sales or Lease Contracts maintain both comprehensive and collision property damage insurance coverage, with deductibles not to exceed the amount stated above.  Debtor shall name Lender as an additional loss payee on any and all insurance policies which provide coverage for Qualified Collateral, Legacy Qualified Collateral or any other Collateral.

(f)      **Compliance with Laws; Sanctions**.  Debtor will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(i)      Subject to clause (ii) below, Debtor will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(ii)      Debtor will comply, and cause each other Obligor and the Affiliates thereof to comply, with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Debtor shall implement and maintain, and cause each other Obligor to implement and maintain, in effect policies and procedures designed to ensure compliance by the Obligors and their respective directors, officers, employees, agents and Affiliates with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

(g)      **Compliance with Agreements**.  Debtor will comply, in all material respects with all material agreements, contracts, and instruments binding on it or affecting its properties, assets or business.

(h)      **Notice of Indebtedness**.  Debtor will promptly inform Lender of the creation, incurrence or assumption by Debtor of any actual or contingent liabilities not permitted under this Agreement.

(i)      **Notices of Material Events**.  Debtor will furnish to Lender prompt written notice of the following:

(i)      the occurrence of any Default;

(ii)      the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against any Obligor that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(iii)      any and all material adverse changes in any Obligor's financial condition and all claims made against any Obligor that could materially affect the financial condition of such Obligor.

Each notice delivered under this Section shall be accompanied by a statement of an officer of Debtor setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

(j)     **Ownership and Liens**. Debtor and Grantor will maintain good and indefeasible title to the Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for Permitted Encumbrances. Debtor and Grantor will cause any financing statement or other security instrument with respect to the Collateral to be terminated, except for Permitted Encumbrances. Debtor and Grantor will defend at their expense Lender's right, title and security interest in and to the Collateral against the claims of any third party.

(k)     **Accounts and General Intangibles**. Debtor and Grantor will, except as otherwise provided herein, collect, at Debtor's own expense, all amounts due or to become due under each of the accounts and general intangibles. In connection with such collections, Debtor and Grantor may and, at Lender's direction, will take such action not otherwise forbidden herein as Debtor and Grantor or Lender may deem reasonably necessary or advisable to enforce collection or performance of each of the accounts and general intangibles. Debtor and Grantor will also duly perform and cause to be performed all of its material obligations with respect to the goods or services, the sale or lease or rendition of which gave rise or will give rise to each account and all of its obligations to be performed under or with respect to the general intangibles. Each of Debtor and Grantor also covenants and agrees to take any action and/or execute any documents that Lender may reasonably request in order to comply with law relating to the assignment of the accounts.

(l)     **Chattel Paper, Documents and Instruments**. Each of Debtor and Grantor will take such action as may be reasonably requested by Lender in order to cause any chattel paper, documents or instruments to be valid and enforceable and will cause all such chattel paper, documents, and instruments to have only one original counterpart. Upon request by Lender, Debtor and Grantor will deliver to Lender all originals of chattel paper, documents or instruments and unless such request is made, Debtor and Grantor will not deliver possession of such chattel paper, documents or instruments to any Person and will mark all chattel paper, documents or instruments with a legend indicating that such chattel paper, document or instrument is subject to the security interest granted hereunder.

(m)     **Waivers and Consents Relating to Real Property Interests**. Upon the request of Lender, Debtor shall cause each mortgagee of real property owned by Debtor and each landlord of real property leased by Debtor to execute and deliver agreements satisfactory in form and substance to Lender by which such mortgagee or landlord (i) waives or subordinates any rights it may have in the Collateral, or (ii) consents to the mortgage or other encumbrance of Debtor's interest in such real property.

(n)     **GPS Systems**. Each of Debtor and Grantor shall maintain GPS systems in all Motor Vehicles where the Sales or Lease Contract is used as Qualified Collateral (other than Legacy Qualified Collateral). Each of Debtor and Grantor shall also, at its sole expense, provide Lender all payment protection device access codes, passwords, tracking information, etc., including but not limited to, Starter Interrupt Codes, GPS monitoring access, etc., for each Motor Vehicle securing a Sales or Lease Contract which serves as Qualified Collateral (other than Legacy Qualified Collateral). Each of Debtor and Grantor will further indemnify Lender and the GPS vendor against any damages resulting from said access to data in the GPS software. Each Sales or Lease Contract shall provide language indicating that Lender may access the GPS system in such Retail Customer's Motor Vehicle. Such language should be included in the Retail Customer signed form attached hereto as Exhibit V.

(o)     **Arbitration Provision**. Each of Debtor and Grantor shall obtain and each Sales or Lease Contract shall indicate the presence of (via a stamp or a checked box on the Sales or Lease Contract) a written binding arbitration agreement from all Retail Customers of Debtor, which agreement must be acceptable to Lender and include a class action waiver provision.

(p)     **Consent for Lender to Contact**. Each of Debtor and Grantor shall cause each Sales or Lease Contract to provide language indicating that Lender may contact Retail Customers. Such language should be included in the Retail Customer signed form attached hereto as Exhibit V.

(q)     **Customer Agreement**. Each of Debtor and Grantor shall cause each Retail Customer to execute a Customer Agreement in the form attached hereto as Exhibit V.

LOAN AND SECURITY AGREEMENT – PAGE 16
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

(r)      **Software**.  Debtor shall license and properly utilize an approved DMS to, among other things, allow Lender to conduct electronic daily reconciliation of Debtor's collections to determine and monitor the Advance Rate.  Debtor shall authorize the DMS vendor to allow Lender full access to all of Debtor's data stored in the DMS.  Debtor shall bear the total expense incurred by Lender associated with any additional software required for Lender to gain access to Debtor's DMS.  Debtor will further indemnify Lender and the DMS vendor against any damages resulting from said access to Debtor's data in the DMS software.  Debtor is encouraged to consult with its own legal counsel regarding privacy laws and possible procedures and/or documents that may be required to notify new and existing Retail Customers of Debtor of the DMS and/or Lender's access to financial and other data regarding the Sales or Lease Contracts.

(s)      **Debtor's Future Affiliates**.  With respect to each Person that becomes an Affiliate of Debtor (directly or indirectly) subsequent to the Effective Date, Debtor will cause such new Affiliate to execute and deliver, or cause to be executed and delivered, to Lender, within TEN (10) days after the date such Person becomes an Affiliate of Debtor:

(i)      a Guaranty, pursuant to which such Affiliate will guarantee in full the payment of the Indebtedness; and

(ii)      a joinder to this Agreement; and

(iii)      a Pledge Agreement, pursuant to which each equity holder of such Affiliate will grant Lender a valid perfected first priority security interest over the Equity Interests (as defined therein). Each of the foregoing shall be in form and substance acceptable to Lender in its reasonable discretion

(t)      **Additional Covenants**.  Each of Debtor and Grantor shall comply with all terms, conditions and requirements set forth on Exhibit II.

8.      **Negative Covenants**.  Until all Indebtedness is indefeasibly paid or performed, and Lender has no further commitment to lend under the Credit Facility, Debtor agrees and covenants as follows:

(a)      **Fundamental Change**.  No Obligor will: (i) make any material change in the nature of its business as carried on as of the Effective Date including (without limitation) opening, closing, or changing business location(s); (ii) liquidate, merge or consolidate with or into any other Person; (iii) make a change in organizational structure (including but not limited to the formation of any Affiliates formed for purposes of reinsurance), management or the jurisdiction in which it is organized; (iv) amend, restate, supplement and/or otherwise modify any Constituent Documents or enter into any new agreement with respect to its equity interests, in each case in a manner that would be adverse to Lender and/or any of its Affiliates, or (v) permit any change in its legal name, or the state of its organization to another jurisdiction.

(b)      **OTHER CHANGES.  DEBTOR WILL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER, (i) CREATE, INCUR OR ASSUME INDEBTEDNESS FOR BORROWED MONEY, INCLUDING CAPITAL LEASES, OTHER THAN INDEBTEDNESS  EXPRESSLY PERMITTED BY THE LOAN DOCUMENTS, (ii) SELL, TRANSFER, MORTGAGE, ASSIGN, OR LEASE ANY ASSET OF DEBTOR (INCLUDING ANY QUALIFIED COLLATERAL OR LEGACY QUALIFIED COLLATERAL), OR GRANT A SECURITY INTEREST IN OR ENCUMBER ANY OF DEBTOR'S ASSETS, IN EACH CASE EXCEPT AS SET FORTH IN EXHIBIT II, OR AS EXPRESSLY PERMITTED BY THE LOAN DOCUMENTS), OR (iii) SELL ANY OF DEBTOR'S ACCOUNTS, EXCEPT TO LENDER.**

(c)      **Debt**.  Debtor will not create, incur, assume or permit to exist any Debt except for the following ("Permitted Debt"):

(i)      The Indebtedness;

(ii)     Debt which is expressly subordinated to the Indebtedness under a subordination agreement in form and substance acceptable to Lender, including but not limited to Debt;

(iii)     Trade payables or similar obligations from time to time incurred in the ordinary course of business other than for borrowed money;

(iv)     Debt to Lender that is evidenced by a Loan and Security Agreement;

(v)     Debt to Good Floor that is evidenced by a Loan and Security Agreement;

(vi)     Debt permitted on Exhibit II.

(d)     **Loans**.  Debtor will not make loans or guarantee any obligation of any other Person except as permitted on Exhibit II or as permitted under the Good Floor Loan and Security Agreement.

(e)     **Transactions with Affiliates**.  Debtor will not enter into any transaction, including, without limitation, the purchase, sale or exchange of property or the rendering of any service, with any Affiliate of Debtor, except in the ordinary course of and pursuant to the reasonable requirements of Debtor's business (upon prior written notice to Lender) and upon fair and reasonable terms no less favorable to Debtor than would be obtained in a comparable arm's-length transaction with a Person or entity not an Affiliate of Debtor. Debtor will not enter into any transactions with Affiliates with respect to any reinsurance agreements except with any Affiliates that are Permitted Reinsurance Companies.

(f)     **Dividends or Distributions**.  Without Lender's prior written consent, Debtor will not declare or pay any dividends or distributions, unless any such dividends or distributions are expressly permitted as set forth in Exhibit II.

(g)     **Impairment of Security Interest**.  Debtor and Grantor will not take any action that would in any manner impair the enforceability of Lender's security interest in any Collateral.

(h)     **Compromise of Collateral**.  Debtor and Grantor will not adjust, settle, compromise, amend or modify any Collateral, except an adjustment, settlement, compromise, amendment or modification in good faith and in the ordinary course of business; provided, however, this exception shall terminate following written notice from Lender upon the occurrence and during the continuation of an Event of Default. Debtor and Grantor shall provide to Lender such information concerning (i) any adjustment, settlement, compromise, amendment or modification of any Collateral, and (ii) any claim asserted by any account debtor for credit, allowance, adjustment, dispute, setoff or counterclaim, as Lender may reasonably request from time to time.

(i)     **Additional Negative Covenants**.  Additional negative covenants may be set forth in Exhibit II.

9.     **Financial Metrics**.  The financial metrics set forth in Exhibit II are performance guidelines Lender will consider in conjunction with any renewal or amendment of this Loan Agreement.

10.     **Reporting Procedures**.  The Reporting Procedures set forth in Exhibit II are performance guidelines Lender will consider in conjunction with any renewal or amendment of this Loan Agreement

(a)     Until all Indebtedness is indefeasibly paid and satisfied, and Lender has no further commitment to lend under the Credit Facility, each Obligor, and any retail dealership that conducts business with Debtor involving Qualified Collateral or Legacy Qualified Collateral, if applicable, shall make all reasonable efforts to provide certain reports to Lender as described in Exhibit II.

(b)     Debtor hereby agrees that Lender may, from time to time in its reasonable discretion, require certain reporting requirements of any Obligor (in addition to those set forth in Exhibit II of this

LOAN AND SECURITY AGREEMENT – PAGE 18
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

Agreement) in response to Lender's interpretation of, or implementation of precautionary measures relative to: (a) the introduction or adoption of, or any change in or in the interpretation, promulgation, implementation or administration of, (i) any law, ordinance, order, rule or regulation of a Governmental Authority, or (ii) any governmental or quasi-governmental rule, regulation, policy, guideline, interpretation or directive (whether or not having the force of law); or (b) compliance by Lender with any guideline or request from any Governmental Authority (whether or not having the force of law), including any request, rule, guideline or directive (i) in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated by any United States financial regulatory authorities.

11.     **Rights of Lender**.  Lender shall have the rights contained in this Section at all times that this Agreement is effective.

(a)     **Financing Statements**.  Each of Debtor and Grantor hereby authorizes Lender to file one or more financing or continuation statements, and amendments thereto, relating to the Collateral.  Each of Debtor and Grantor hereby irrevocably authorizes Lender at any time and from time to time to file in any Code jurisdiction any initial financing statements and amendments thereto that: (i) indicate the Collateral (1) as all assets or words of similar effect; regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Code, or (2) as being of an equal or lesser scope or with greater detail; and (ii) contain any other information required by Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment.

(b)     **Power of Attorney**.  Each Obligor hereby irrevocably appoints Lender as Obligor's attorney-in-fact, such power of attorney being coupled with an interest, with full authority in the place and stead of Obligor and in the name of Obligor or otherwise, from time to time in Lender's reasonable discretion, to take any action and to execute any instrument which Lender may deem necessary or appropriate to accomplish the purposes of this Agreement, including without limitation: (i) to obtain and adjust insurance required by Lender hereunder; (ii) to demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of the Collateral; (iii) to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above; (iv) to file any claims or take any action or institute any proceedings which Lender may deem necessary or appropriate for the collection and/or preservation of the Collateral or otherwise to enforce the rights of Lender with respect to the Collateral; and (v) sell all or any part of the Collateral.

(c)     **DMS**.  Debtor hereby authorizes Lender to have access to all DMS systems and all associated retail, commercial, sales, leasing, financing, title, payment, banking, portfolio performance data and all other data generally available in the DMS and available to, or used or purchased by, Debtor or its Affiliates, subsidiaries or related companies including, and all of its various related systems and functions, whether hosted online, at Debtor's site or in any other place or system.  Debtor further consents to and authorizes Lender to utilize such DMS, by any means, from time to time or at any time, to inspect or confirm any information related to Debtor and/or to contact the DMS vendor directly from time to time or at any time to arrange for unlimited access to the DMS, regardless of the business relationship that may exist between Debtor and Lender or between Debtor and the DMS vendor at such time, which shall continue until such time as Lender shall agree in writing that such access and contact is no longer necessary or a matter of Lender's business due to the termination of this Agreement.  Debtor further authorizes and instructs the DMS vendor to release to Lender any and all information related to Debtor, as requested by Lender.  Debtor further waives any and all rights of privacy related to information obtained by Lender related to such DMS.  The intention of this Section is to grant and insure Lender complete and full access to all of Debtor's DMS data, which shall be unlimited in all events and at an times, including upon a Default.  This Section shall remain valid under all circumstances, except as provided herein, including Debtor's specific direction or instruction to the DMS to stop or otherwise preclude Lender's access to such DMS.  In the event that Debtor fails to pay its ongoing obligations to the DMS vendor, Lender shall have the right to make any such payments on a going forward basis to compensate the DMS vendor for any costs associated with Lender's access to the DMS.

(d)     **Performance by Lender**.  If any Obligor fails to perform any agreement or obligation provided for in any Loan Document, Lender may itself perform, or cause performance of, such agreement or

obligation, and the expenses of Lender incurred in connection therewith shall be a part of the Indebtedness, secured by the Collateral and payable by Debtor on demand.

(e)  **Audits**.  Lender or its agents, vendors or contractors (including its lawyers and accountants) shall have the right to verify and/or audit various aspects of Obligor's business and representations, at the time and in the manner as solely determined by Lender, including but not limited to the right to:

(i)  Contact individual retail buyers or lessees of Motor Vehicles evidenced by Sales or Lease Contracts that have been submitted to Lender for consideration as Qualified Collateral or Legacy Qualified Collateral or have already been pledged to Lender as Qualified Collateral or Legacy Qualified Collateral;

(ii)  Access all of Obligor's data stored in Obligor's DMS systems and software, Obligor's document scanning system and Obligor's GPS systems;

(iii)  Perform legal, Collateral, compliance, financial and/or operational audits at the time of the loan origination and periodically thereafter, upon written request to Obligor, with all of Lender's cost of the audits to be paid solely by Obligor; and

(iv)  Perform periodic inspections of all assets, inventory, records, documents and any other information related to the Collateral.

(f)  **Action Against Customer of Obligor**.  Lender may take any other action it deems necessary directly against the buyer of the Motor Vehicle to preserve and protect Lender's interest in and under the Sales or Lease Contract, all without prejudice to any rights or remedies of Lender as against Obligor.

(g)  **Credit and Background Checks**.  Lender has performed or will perform, and is authorized to perform, credit and background checks in connection with this Agreement on all of the Obligors, and Obligors further authorize Lender, in its sole and absolute discretion, to perform additional credit and background checks and rechecks at any time on any or all of the parties obligated hereunder.

12.  **Accounts**.

(a)  **Payment Account**. Debtor shall establish the Payment Account in its name and execute a Blocked Account Agreement establishing control in favor of the lender on such Account.  Debtor shall make a daily deposit of all revenues received from Retail Customer payments, including but not limited to, principal, interest, lease payments, full payoffs, partial payoffs and insurance proceeds on Pledged Accounts, excluding any revenues received as down payments, fees and service payments, into such deposit account. Debtor shall ensure that all individual Retail Customer checks, money orders and electronic payments of any sort and that all other non-cash payments from Retail Customers on or related to note or lease receivables shall be individually scanned and deposited into such Payment Account.  All cash payments shall be either deposited directly into the Payment Account (wherever a local branch of the bank holding the Payment Account is available to receive such deposits) or deposited daily into Debtor's Operating Account and then further deposited into the Payment Account on that same day via a check draw on the Debtor's Operating Account.  Lender will reconcile the deposits made into such account with the information recorded in Debtor's DMS.  Lender shall be entitled to debit the Payment Account weekly to service payments on the Indebtedness.  Debtor may be entitled to request from Lender that funds held in such deposit account be released to Debtor and deposited into Debtor's Operating Account (provided that Lender shall never be obligated to honor more than one such request per week), but only to the extent that the Borrowing Base exceeds the outstanding principal amount of the Loans.  Debtor hereby pledges the Payment Account to serve as collateral for the Indebtedness and Lender may, without notice to Debtor, draw upon the principal and/or interest balance of the Payment Account in order to satisfy any delinquent obligations of Debtor, including curing Overadvances.

(b)    **Operating Accounts**.  Debtor shall have or shall establish the Operating Accounts in its name that it will use for the operation of its business.  Debtor hereby pledges the Operating Accounts to serve as collateral for the Indebtedness and Lender may, without notice to Debtor, draw upon the balance of the Operating Accounts in order to satisfy any Event of Default, including curing Overadvances.

(c)    **Bank Access and Bank Statements**.  For any of Debtor's bank deposit accounts including the Payment Account and Operating Account, Debtor shall provide Lender daily online access to such deposit accounts, as well as a copy of its monthly bank statements for all of its bank accounts within **THREE (3)** days of receipt of same.

13.    **Events of Default**.  Each of the following shall constitute an "Event of Default" under this Agreement:

(a)    **Payment Default**.  The failure, refusal or neglect of Debtor to pay when due any part of the principal of, or interest on the Indebtedness owing to Lender by Debtor or any other indebtedness or obligations due and owing from Debtor to Lender under the Loan Documents from time to time and such failure, refusal or neglect shall continue unremedied for **THREE (3)** days.

(b)    **Performance or Warranty Default**.  Except as otherwise provided in this Agreement, the failure of any Obligor to timely and properly observe, keep or perform any covenant, agreement, warranty or condition required herein or in any of the other Loan Documents or any other agreement with Lender which is not cured within **FIFTEEN (15)** days following written notice from Lender to such Obligor.

(c)    **Representations**.  Any representation contained herein or in any of the other Loan Documents made by an Obligor is false, misleading or erroneous in any material respect when made or when deemed to have been made.

(d)    **Default under other Debt**.  The occurrence of any event which permits the acceleration of the maturity of any Debt for borrowed money owing by any Obligor to any third party under any agreement or understanding.

(e)    **Insolvency**.  If any Obligor: (i) becomes insolvent, or makes a transfer in fraud of creditors, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due; (ii) generally is not paying its debts as such debts become due; (iii) has a receiver, trustee or custodian appointed for, or take possession of, all or substantially all of its assets, either in a proceeding brought by it or in a proceeding brought against it or it consents to or acquiesces in such appointment or possession; (iv) files a petition for relief under the United States Bankruptcy Code or any other present or future federal or state insolvency, Bankruptcy or similar laws (all of the foregoing hereinafter collectively called "Applicable Bankruptcy Law") or an involuntary petition for relief is filed against it under any Applicable Bankruptcy Law, or an order for relief naming it is entered under any Applicable Bankruptcy Law, or any composition, rearrangement, extension, reorganization or other relief of debtors now or hereafter existing is requested or consented to by it; or (v) fails to have discharged immediately any attachment, sequestration or similar writ levied upon any property of it.

(f)    **Judgment**.  The entry of any judgment against any Obligor or the issuance or entry of any attachments or other liens against any of the property of such Obligor for an amount in excess of **TEN THOUSAND AND NO/100 DOLLARS ($10,000.00)** (individually or in the aggregate) if uninsured, undischarged, unbonded or undismissed on the date on which such judgment could be executed upon.

(g)    **Action Against Collateral**.  The Collateral or any portion thereof is taken on execution or other process of law in any action.

(h)    **Death or Incompetence of an Obligor; Dissolution of Certain Person**.  Any Obligor that is (i) a natural Person shall have died or have been declared incompetent by a court of proper jurisdiction,

LOAN AND SECURITY AGREEMENT – PAGE 21
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

or (ii) not a natural Person shall have been dissolved, liquidated, or merged or consolidated with or into any other Person without the prior written consent of Lender.

(i)  **Action of Lien Holder**.  The holder of any lien or security interest on the Collateral (without hereby implying the consent of Lender to the existence or creation of any such lien or security interest on the Collateral), declares a default thereunder or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(j)  **Material Adverse Effect**.  Any event shall have occurred or is continuing which shall have had a Material Adverse Effect.

(k)  **Loan Documents**.  (i) The Loan Documents shall at any time after their execution and delivery and for any reason cease (1) to create a valid and perfected first priority security interest (subject to Permitted Encumbrances) in and to the Collateral; or (2) to be in full force and effect or shall be declared null and void, or (ii) the validity of enforceability the Loan Documents shall be contested by any Obligor or any other Person party thereto or any Obligor shall deny it has any further liability or obligation under the Loan Documents.

(l)  **Good Floor Events of Default**.  Any Event of Default shall have occurred under the Good Floor Loan and Security Agreement.

(m)  **Overadvance**.  The failure of Debtor to timely and promptly pay any Overadvance as required herein or in any of the other Loan Documents or any other agreement with Lender and which is not cured within THREE (3) days following written notice from Lender to Debtor declaring an Event of Default pursuant to Section 2(a).

Nothing contained in this Agreement shall be construed to limit the events of default enumerated in any of the other Loan Documents and all such events of default shall be cumulative.

14.  **Remedies and Related Rights**.  If an Event of Default shall have occurred and be continuing, and without limiting any other rights and remedies provided herein, under any of the Loan Documents or otherwise available to Lender, Lender may exercise one or more of the rights and remedies provided in this Section.

(a)  **Remedies**.  Upon the occurrence of any one or more of the foregoing Events of Default, (i) the entire unpaid balance of principal of the Note, together with all accrued but unpaid interest thereon, and all other Indebtedness owing to Lender by Obligor at such time shall, at the option of Lender, become immediately due and payable without further notice, demand, presentation, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest or notice of protest of any kind, all of which are expressly waived by Obligor, and (ii) Lender may, at its option, cease further advances under the Note and this Agreement; provided however, concurrently and automatically with the occurrence of an Event of Default under Section 13(e) further advances under the Loan Documents shall automatically cease, the Indebtedness at such time shall, without any action by Lender, become due and payable, without further notice, demand, presentation, notice of dishonor, notice of acceleration, notice of intent to accelerate, protest or notice of protest of any kind, all of which are expressly waived by Obligor.  All rights and remedies of Lender set forth in this Agreement and in any of the other Loan Documents may also be exercised by Lender, at its option to be exercised in its sole discretion, upon the occurrence of an Event of Default, and not in substitution or diminution of any rights now or hereafter held by Lender under the terms of any other agreement.

(b)  **Other Remedies**.  Upon the occurrence of any one or more of the foregoing Events of Default, Lender may from time to time at its discretion, without limitation and without notice except as expressly provided in any of the Loan Documents:

(i)  Exercise in respect of the Collateral all the rights and remedies of a secured party under the Code (whether or not the Code applies to the affected Collateral);

(ii)      Require Obligor to, and Obligor hereby agrees that it will at its expense and upon request of Lender, assemble the Collateral as directed by Lender and make it available to Lender at a place to be designated by Lender which is reasonably convenient to both parties;

(iii)      Reduce its claim to judgment or foreclose or otherwise enforce, in whole or in part, the security interest granted hereunder by any available judicial procedure;

(iv)      Sell or otherwise dispose of, at its office, on the premises of Obligor or elsewhere, the Collateral, as a unit or in parcels, by public or private proceedings, and by way of one or more contracts (it being agreed that the sale or other disposition of any part of the Collateral shall not exhaust Lender's power of sale, but sales or other dispositions may be made from time to time until all of the Collateral has been sold or disposed of or until the Indebtedness has been paid and performed in full), and at any such sale or other disposition it shall not be necessary to exhibit any of the Collateral;

(v)      Buy the Collateral, or any portion thereof, at any public sale;

(vi)      Buy the Collateral, or any portion thereof, at any private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations;

(vii)      Apply for the appointment of a receiver for the Collateral, and Obligor hereby consents to any such appointment; and

(viii)      At its option, retain the Collateral in satisfaction of the Indebtedness whenever the circumstances are such that Lender is entitled to do so under the Code or otherwise.

(c)      **Application of Proceeds**.  If any Event of Default shall have occurred and is continuing, Lender may at its discretion apply or use any cash held by Lender as Collateral, and any cash proceeds received by Lender in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral as follows in such order and manner as Lender may elect:

(i)      to the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender in connection with (1) the administration of the Loan Documents, (2) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, and (3) the exercise or enforcement of any of the rights and remedies of Lender hereunder;

(ii)      to the payment or other satisfaction of any liens and other encumbrances upon the Collateral;

(iii)      to the satisfaction of the Indebtedness;

(iv)      by holding such cash and proceeds as Collateral;

(v)      to the payment of any other amounts required by applicable law; and

(vi)      by delivery to Obligor or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

(d)      **License**.  Lender is hereby granted a license or other right to use, following the occurrence and during the continuance of an Event of Default, without charge, Obligor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, Retail Customer lists and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral, and, following the occurrence and during the continuance of an Event of Default, Obligor's rights under all licenses and all franchise agreements shall

LOAN AND SECURITY AGREEMENT – PAGE 23
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

inure to Lender's benefit. In addition, Obligor hereby irrevocably agrees that Lender may, following the occurrence and during the continuance of an Event of Default, sell any of Obligor's inventory directly to any Person, including without limitation Persons who have previously purchased Obligor's inventory from Obligor and in connection with any such sale or other enforcement of Lender's rights under this Agreement, may sell inventory which bears any trademark owned by or licensed to Obligor and any inventory that is covered by any copyright owned by or licensed to Obligor and Lender may finish any work in process and affix any trademark owned by or licensed to Obligor and sell such inventory as provided herein.

(e)    **Deficiency**.  In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral by Lender are insufficient to pay all amounts to which Lender is legally entitled, each Obligor (unless otherwise provided) shall be liable for the deficiency, together with interest thereon as provided in the Loan Documents.

(f)    **Non-Judicial Remedies**.  In granting to Lender the power to enforce its rights hereunder without prior judicial process or judicial hearing, Obligor expressly waives, renounces and knowingly relinquishes any legal right which might otherwise require Lender to enforce its rights by judicial process. Obligor recognizes and concedes that non-judicial remedies are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length. Nothing herein is intended to prevent Lender or Obligor from resorting to judicial process at either party's option.

(g)    **Use and Possession of Certain Premises**.  Upon the occurrence of an Event of Default, Lender shall be entitled to occupy and use any premises owned or leased by Obligor where any of the Collateral or any records relating to the Collateral are located until the Indebtedness is paid or the Collateral is removed therefrom, whichever first occurs, without any obligation to pay Obligor for such use and occupancy.

(h)    **Other Recourse**.  Each Obligor waives any right to require Lender to proceed against any third party, exhaust any Collateral or other security for the Indebtedness, or to have any third party joined with Obligor in any suit arising out of the Indebtedness or any of the Loan Documents, or pursue any other remedy available to Lender. Each Obligor further waives any and all notice of acceptance of this Agreement and of the creation, modification, rearrangement, renewal or extension of the Indebtedness. Each Obligor further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party. Until all of the Indebtedness shall have been paid in full, Obligor shall have no right of subrogation and each Obligor waives the right to enforce any remedy which Lender has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Lender. Each Obligor authorizes Lender, and without notice or demand and without any reservation of rights against such Obligor and without affecting such Obligor's liability hereunder or on the Indebtedness to: (i) take or hold any other property of any type from any third party as security for the Indebtedness, and exchange, enforce, waive and release any or all of such other property; (ii) apply such other property and direct the order or manner of sale thereof as Lender may in its discretion determine; (iii) renew, extend, accelerate, modify, compromise, settle or release any of the Indebtedness or other security for the Indebtedness; (iv) waive, enforce or modify any of the provisions of any of the Loan Documents executed by any third party; and (v) release or substitute any third party.

(i)    **No Waiver; Cumulative Remedies**.  No failure on the part of Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power, or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  The rights and remedies provided for in this Agreement and the other Loan Documents are cumulative and not exclusive of any rights and remedies provided by law.

(j)    **Equitable Relief**.  Obligor recognizes that in the event Obligor fails to pay, perform, observe, or discharge any or all of the Indebtedness, any remedy at law may prove to be inadequate relief to Lender.  Obligor therefore agrees that Lender, if Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

15.    **Cross-Collateralization and Cross-Default**.  Obligor and Lender contemplate that Obligor and Lender, [Good Floor/PRE], and/or Lender's Affiliate have engaged or may, from time to time engage, in various loan transactions and that from time to time other circumstances may arise, in which Obligor becomes obligated to Lender, [Good Floor/PRE], and/or another of Lender's Affiliates, including transactions of a type that are very different from the transactions evidenced by the Loan Documents, including by notes, advances, overdrafts, bookkeeping entries, guaranty agreements, deeds of trust, or any other method or means (each a "Loan Obligation").  Obligor and Lender agree that all such transactions will be secured by the Collateral, and that the Indebtedness arising under this Agreement and the other Loan Documents will be secured by any collateral granted in connection with such Loan Obligation.  Repayment of all Indebtedness and performance of all other obligations under this Agreement by Obligor shall not terminate Lender's security interests in the Collateral, unless Lender executes a written release.  If any default occurs under any Loan Obligation, then Lender may declare an Event of Default.  An Event of Default shall be a default under such Loan Obligation.  Lender's failure to exercise cross-defaults shall not constitute a waiver by Lender of such right.  This Agreement shall be further cross-collateralized and cross-defaulted as set forth in Exhibit II.

16.    **Indemnity**.  Obligor hereby indemnifies and agrees to hold harmless Lender, and its Affiliates, officers, directors, employees, agents and representatives (each an "Indemnified Person") from and against any and all liabilities, obligations, claims, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature (collectively, the "Claims") which may be imposed on, incurred by, or asserted against, any Indemnified Person arising in connection with the Loan Documents, the Indebtedness or the Collateral (including without limitation, the enforcement of the Loan Documents and the defense of any Indemnified Person's actions and/or inactions in connection with the Loan Documents). **WITHOUT LIMITATION, THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO ANY CLAIMS WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH INDEMNIFIED PERSON (NOT INCLUDING A MATERIAL BREACH OF ANY PROVISION OF A LOAN DOCUMENT BY LENDER), EXCEPT TO THE LIMITED EXTENT THE CLAIMS AGAINST AN INDEMNIFIED PERSON ARE PROXIMATELY CAUSED BY SUCH INDEMNIFIED PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT**. If Obligor or any third party ever alleges such gross negligence or willful misconduct by any Indemnified Person, the indemnification provided for in this Section shall nonetheless be paid upon demand, subject to later adjustment or reimbursement, until such time as: (a) a court of competent jurisdiction enters a final judgment as to the extent and effect of the alleged gross negligence or willful misconduct; or (b) Lender has expressly agreed in writing with Obligor that such Claim is proximately caused by such Indemnified Person's gross negligence or willful misconduct.  The indemnification provided for in this Section shall survive the termination of this Agreement and shall extend and continue to benefit each individual or entity that is or has at any time been an Indemnified Person hereunder.

17.    **Limitation of Liability**.  Neither Lender nor any officer, director, employee, attorney, or agent of Lender shall have any liability with respect to, and Obligor hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Obligor in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.  Obligor hereby waives, releases, and agrees not to sue Lender or any of Lender's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.

18.    **No Duty**.  All attorneys, accountants, appraisers, and other professional Persons and consultants retained by Lender shall have the right to act exclusively in the interest of Lender and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to any Obligor or any of any Obligor's equity holders or any other Person.  Documents in connection with the transactions contemplated hereunder have been prepared by Lender's counsel.  Obligor acknowledges and understands that Lender's counsel is acting solely as counsel to Lender in connection with the transaction contemplated herein, is not representing Obligor in connection therewith, and has not, in any manner, undertaken to assist or render legal advice to Obligor with respect to this transaction.  Each Obligor has been advised to seek other legal counsel to represent each Obligor's interests in connection with the transactions contemplated herein.

19.    **Lender not Fiduciary**.  The relationship between Obligors and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with any Obligor, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between any Obligor and Lender to be other than that of debtor and creditor.

20.    **No Waiver; Agreement**.  Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege herein or under any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No waiver of any provision in this Agreement or in any of the other Loan Documents and no departure by any Obligor therefrom shall be effective unless the same shall be in writing and signed by Lender, and then shall be effective only in the specific instance and for the purpose for which given and to the extent specified in such writing.  No modification or amendment to this Agreement or to any of the other Loan Documents shall be valid or effective unless the same is signed by the party against whom it is sought to be enforced.

21.    **Benefits**.  This Agreement shall be binding upon and inure to the benefit of Lender and Obligors, and their respective heirs, personal representatives, successors and assigns, provided, however, that no Obligor may, without the prior written consent of Lender, assign any rights, powers, duties or obligations under this Agreement or any of the other Loan Documents.

22.    **Notices**.  All notices, requests, demands or other communications required or permitted to be given pursuant to this Agreement shall be in writing and given by: (a) electronic mail; (b) personal delivery; (c) expedited delivery service with proof of delivery; or (d) United States mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressee at the address set forth on the signature page hereof and shall be deemed to have been received either, in the case of personal delivery, as of the time of personal delivery, in the case of expedited delivery service, as of the time of the expedited delivery and in the manner provided herein, or in the case of mail, upon the **THIRD (3ʳᵈ)** day after deposit in a depository receptacle under the care and custody of the United States Postal Service.  Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by notice to the other party of such new address.

23.    **Construction; Venue; Service of Process**.  The Loan Documents have been executed and delivered in the State of Texas, shall be governed by and construed in accordance with the laws of the State of Texas, and shall be performable by the parties hereto in Collin County, Texas (the "Venue Site").  Any action or proceeding against any Obligor under or in connection with any of the Loan Documents may be brought in any state or federal court within the Venue Site.  Each Obligor hereby irrevocably: (a) submits to the nonexclusive jurisdiction of such courts; and (b) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any such court or that any such court is an inconvenient forum.  Each Obligor agrees that service of process upon it may be made by certified or registered mail, return receipt requested, at its address specified or determined in accordance with the provisions of this Agreement.  Nothing in any of the other Loan Documents shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against any Obligor or with respect to any of its property in courts in other jurisdictions.  Any action or proceeding by any Obligor against Lender shall be brought only in a court located in the Venue Site.

24.    **Patriot Act Notice**.  Lender hereby notifies each Obligor that pursuant to the requirements of Section 326 of the USA Patriot Act of 2001, 31 U.S.C. § 5318, that Lender is required to obtain, verify and record information that identifies such Obligor, which information includes the name and address of such Obligor and other information that will allow such Lender to identify such Obligor in accordance with Section 326 of the USA Patriot Act of 2001, 31 U.S.C. § 5318.

25.    **Regulation B—Notice of Joint Intent**.  If Obligor is more than one Person, Federal Regulation B (Equal Credit Opportunity Act) requires Lender to obtain evidence of each Obligor's intention to apply for joint credit.  Each Obligor's signature below shall evidence such intent.  Each Obligor's intent shall apply to future related extensions of joint credit and joint guaranty.

26.    **Invalid Provisions**.  If any provision of the Loan Documents is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable and the remaining provisions of

the Loan Documents shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance.

27.    **Expenses**.  Debtor shall pay all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) in connection with: (a) the drafting and execution of the Loan Documents and the transactions contemplated therein; (b) any action required in the course of administration of the Indebtedness and obligations evidenced by the Loan Documents; and (c) any action in the enforcement of Lender's rights upon the occurrence of an Event of Default.  An Origination Expense Prepayment Amount is set forth in Section II.

28.    **Participation of the Loans**.  Debtor agrees that Lender may, at its option, sell interests in the Loans and its rights under this Agreement and, in connection with each such sale, Lender may disclose any financial and other information available to Lender concerning Debtor to each prospective purchaser subject to obtaining a confidentiality agreement with each prospective purchaser prior to disclosing Debtor's confidential information.  In connection therewith, each Obligor shall execute and deliver or cause to be executed and delivered all of the notes, instrument, documents and other agreements reasonably required by Lender to effectuate the sale of such interests.

29.    **Conflicts**.  Except as otherwise expressly provided in the Note, in the event any term or provision of this Agreement is inconsistent with or conflicts with any provision of the other Loan Documents, the terms and provisions contained in this Agreement shall be controlling.

30.    **Counterparts**.  The Loan Documents may be separately executed in any number of counterparts, each of which shall be an original, but all of which, taken together, shall be deemed to constitute one and the same instrument.

31.    **Survival**.  All representations and warranties made in the Loan Documents or in any document, statement, or certificate furnished in connection with this Agreement shall survive the execution and delivery of the Loan Documents, and no investigation by Lender or any closing shall affect the representations and warranties or the right of Lender to rely upon them.

32.    **Waiver of Right to Trial by Jury**.  **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THE LOAN DOCUMENTS OR THE ACTS OR FAILURE TO ACT OF OR BY LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.**

33.    **Notice of Final Agreement**.  It is the intention of each Obligor and Lender that the following **NOTICE OF FINAL AGREEMENT** be incorporated by reference into each of the Loan Documents (as the same may be amended, modified or restated from time to time).  Each Obligor and Lender warrant and represent that the entire agreement made and existing by or among each Obligor and Lender with respect to the Loans is and shall be contained within the Loan Documents, and that no agreements or promises exist or shall exist by or among, any Obligor and Lender that are not reflected in the Loan Documents.

**NOTICE OF FINAL AGREEMENT**

**THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES, AND THE SAME MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*
*SIGNATURE PAGE FOLLOWS.*

**AGREED** as of the Effective Date.

**LENDER**:

PRIMALEND CAPITAL PARTNERS, LP,
a Texas limited partnership

By:    LNCMJ MANAGEMENT, LLC,
       a Texas limited liability company
       its general partner


       By:    _____
       Name:  Mark A. Jensen
       Title:   Manager

*With copies of notices to Lender's counsel:*


**DEBTOR/GRANTOR**:

OHA PAPI, LLC,
a Texas limited liability company

By:    _____
Name:  Kathryn A. Gruner
Title:   Manager

**ADDRESS**:

3460 Lotus Drive, Suite 100
Plano, TX 75075


Spencer Fane LLP
5700 Granite Parkway, Suite 650
Plano, Texas 75024
Attention:      Caleb M. Rush


**ADDRESS**:

11700 Garland Road
Dallas, Texas 75218


*GUARANTOR SIGNATURES ON THE FOLLOWING PAGE*


LOAN AND SECURITY AGREEMENT – SIGNATURE PAGE
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

## JOINDER OF GUARANTOR

GUARANTOR hereby agrees and consents to the provisions of this Agreement and agrees to be bound by the terms and conditions set forth therein. All representations and warranties applicable to Guarantor contained in the Agreement are true and correct on and as of the Effective Date.

**GUARANTOR**:

_____
KATHRYN A. GRUNER

**ADDRESS**:

5905 Steuben Court
Dallas, Texas 75248

LOAN AND SECURITY AGREEMENT – GUARANTOR SIGNATURE PAGE
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC