# **<u>Exhibit D</u>**

# AMENDMENT TO LOAN DOCUMENTS

**THIS AMENDMENT TO LOAN DOCUMENTS** (this "*Amendment*") dated as of **JUNE** 17, **2024** (the "*Amendment Effective Date*"), is by and between (a) **PRIMALEND CAPITAL PARTNERS, LP**, a Texas limited partnership (together with its successors and assigns, "*Lender*"), (b) **OHA PAPI, LLC**, a Texas limited liability company d/b/a Simple Auto DFW ("*Debtor*"), and (c) **KATHRYN A. GRUNER**, an individual residing the state of Texas ("*Guarantor*", and together with Debtor, "*Obligor*").

## RECITALS

**WHEREAS**, Debtor, Guarantor and Lender entered into that certain **LOAN AND SECURITY AGREEMENT** dated as of **MAY 15, 2024** (as amended, renewed and restated from time to time, the "*Agreement*");

**WHEREAS**, under the Agreement, among other documents, Debtor executed and delivered to Lender that certain **PROMISSORY NOTE** dated as of **MAY 15, 2024**, in the original principal amount of **ONE MILLION AND NO/100 DOLLARS ($1,000,000.00)** (as amended, renewed and restated from time to time, the "*Note*");

**WHEREAS**, the parties desire to amend the Agreement and modify the Note pursuant to the terms and conditions set forth herein;

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Definitions**. Capitalized terms used in this Amendment, to the extent not otherwise defined herein, shall have the same meanings as in the Agreement, as amended hereby.

2.      **Modification to Definitions in the Loan Agreement**. The following definition in Section 1 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Collateral" means:

(a)      All Sales and Lease Contracts, including, without limitation, the Purchased Portfolio, all Qualified Collateral, all Legacy Qualified Collateral, and/or all Legacy Qualified Collateral.

(b)      Any property or asset, whether real or personal, pledged by a Grantor to secure the Indebtedness.

(c)      All present and future accounts, chattel paper (including electronic chattel paper), commercial tort claims, commodity accounts, commodity contracts, deposit accounts, documents, financial assets, general intangibles, health care insurance receivables, instruments, Intellectual Property, investment property, letters of credit, letter of credit rights, payment intangibles, securities, security accounts and security entitlements now or hereafter owned, held or acquired.

(d)      All present and hereafter acquired inventory (including without limitation, Motor Vehicles) and goods (including without limitation, all raw materials, work in process and finished goods) held, possessed, owned, held on consignment or held for sale, lease, return or to be furnished under contracts of services, in whole or in part, wherever located.

(e)      All equipment and fixtures of whatsoever kind and character now or hereafter possessed, held, acquired, leased or owned, together with all replacements, accessories, additions, substitutions and accessions to all of the foregoing, and all records relating in any way to the foregoing.

(f)      All books, records, data, plans, manuals, computer software, computer tapes, computer systems, computer disks, computer programs, source codes and object codes containing any information pertaining directly or indirectly to the Collateral and all rights to retrieve data and other information pertaining directly or indirectly to the Collateral from third parties.

The term "Collateral," as used herein, shall also include: (a) any other property or assets, real or personal, tangible or intangible, now existing or hereafter acquired, of any Obligor that may at any time be or become subject to a security interest or lien in favor of Lender as security for the Indebtedness; and (b) all SUPPORTING OBLIGATIONS, PRODUCTS and PROCEEDS of all of the foregoing (including without limitation, insurance payable by reason of loss or damage to the foregoing property) and any property, assets securities, guaranties or monies of Debtor which may at any time come into the possession of Lender. The designation of proceeds does not authorize Debtor to sell, transfer or otherwise convey any of the foregoing property except in the ordinary course of Debtor's business or as otherwise provided herein. For the avoidance of doubt, any personal property of Debtor which is not pledged to Lender as Collateral must be specifically set forth in Exhibit II.

3.     **Modification to Definitions in the Loan Agreement**. The following definition is hereby added to Section 1 of the Loan Agreement as follows:

"Purchased Portfolio" means those certain Sales Contracts purchased on June __, 2024, through a foreclosure sale in accordance with the Code, and any substitutes and replacements for, payments received on, and/or any proceeds related thereto. For any Sales Contract in the Purchased Portfolio to remain as Qualified Collateral, it shall continue to satisfy each of the requirements set forth in the definition of Qualified Collateral. Failure to comply with such requirements shall cause the Sales Contract under the Purchased Portfolio to be disqualified as Qualified Collateral.

4.     **Increase to the Amount of the Note**. The notational amount of the Note is hereby increased to **THIRTY-SEVEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($37,500,000.00)**. All references in the Note and the Agreement to the Loan amount "**ONE MILLION AND NO/100 DOLLARS ($1,000,000.00)**" and "**$1,000,000.00**" are hereby deleted in their entirety and replaced with **THIRTY-SEVEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($37,500,000.00)**" and "**$37,500,000.00**" respectively.

5.     **Modification of the Note**. As of the Amendment Effective Date, Section 1 of the Note is hereby deleted in its entirety and replaced with the following:

"1.     **Rate**. Prior to the Maturity Date or an Event of Default, the Rate shall be the lesser of (a) the **MAXIMUM RATE**, or (b) the greater of (i) the **TERM SOFR** plus **9.50%** or (ii) **10.00%** (the interest rate floor). Notwithstanding the foregoing, at any time there is an Overadvance and for so long as such Overadvance remains unpaid, the Rate on the unpaid principal balance of the Note may be increased without advance notice to Debtor at Lender's discretion up to the lesser of (i) **18.00%,** or (ii) the **MAXIMUM RATE.** The term "Term SOFR" means a variable rate of interest per annum equal to the 1 Month CME Term SOFR Rate, as administered by the Term SOFR Administrator (or a successor administrator of the term secured overnight financing rate) and published on the applicable screen page (or such other commercially available source providing such rate or quotations as may be designated by Lender from time to time) on the Term SOFR Administrator's Website. "Term SOFR Administrator" means the CME Group Benchmark Administration (or a successor administrator of Term SOFR). "Term SOFR Administrator's Website" means the website of the Term SOFR Administrator, currently at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html, or any successor source for the secured overnight financing rate identified as such by the Term SOFR Administrator from time to time. If the Term SOFR is no longer published on the Term SOFR Administrator's Website, then the Term SOFR shall be determined by reference to another similar lending rate index, generally accepted on a national basis, as selected by Lender in its sole and absolute discretion. The SOFR Rate shall be adjusted from time to time in Lender's sole discretion for then-applicable reserve requirements, deposit insurance assessment rates, marginal emergency, supplemental, special and other reserve percentages, and other regulatory costs. Notwithstanding any provision of this Note or any other agreement or commitment between Debtor and Lender, whether written or oral, express or implied, Lender shall never be entitled to charge, receive or collect, nor shall amounts received hereunder be credited so that Lender shall be paid, as interest a sum greater than interest at the Maximum Rate. It is the intention of the parties that this Note, and all instruments securing the payment of this Note or executed or delivered in connection therewith, shall comply with applicable law. If Lender ever contracts for, charges, receives or collects anything of value which is deemed to be interest under applicable

law, and if the occurrence of any circumstance or contingency, whether acceleration of maturity of this Note, prepayment of this Note, delay in advancing proceeds of this Note or any other event, should cause such interest to exceed the Maximum Rate, any amount which exceeds interest at the Maximum Rate shall be applied to the reduction of the unpaid principal balance of this Note or any other Indebtedness, and if this Note and such other Indebtedness are paid in full, any remaining excess shall be paid to Debtor. In determining whether the interest exceeds interest at the Maximum Rate, the total amount of interest shall be spread, prorated and amortized throughout the entire term of this Note until its payment in full. The term "Maximum Rate" as used in this Note means the maximum nonusurious rate of interest per annum permitted by whichever of applicable United States federal law or Texas law permits the higher interest rate, including to the extent permitted by applicable law, any amendments thereof hereafter or any new law hereafter coming into effect to the extent a higher Maximum Rate is permitted thereby. If at any time the Rate shall exceed the Maximum Rate, the Rate shall be automatically limited to the Maximum Rate until the total amount of interest accrued hereunder equals the amount of interest which would have accrued if there had been no limitation to the Maximum Rate. To the extent, if any, that Chapter 303 of the Texas Finance Code, as amended, (the "Act") is relevant to Lender for purposes of determining the Maximum Rate, the parties elect to determine the Maximum Rate under the Act pursuant to the "weekly ceiling" from time to time in effect, as referred to and defined in §303.001-303.016 of the Act; subject, however, to any right Lender subsequently may have under applicable law to change the method of determining the Maximum Rate."

6.    **Amendment to Exhibit II to the Agreement**. Exhibit II to the Agreement is hereby deleted in its entirety and replaced with Exhibit II as attached hereto.

7.    **No Novation**. Neither the execution, delivery and acceptance of this Amendment nor any of the terms, covenants, conditions or other provisions set forth herein are intended, nor shall they be deemed or construed, to effect a novation of any liens or Indebtedness under any Note.

8.    **Conditions Precedent**. The obligations of Lenders under this Amendment shall be subject to the condition precedent that Obligors shall have executed and delivered to Lenders this Amendment and such other documents and instruments incidental and appropriate to the transaction provided for herein as Lenders or its counsel may reasonably request.

9.    **Additional Reporting**. Debtor hereby agrees that Lenders may, from time to time in its reasonable discretion, require certain reporting requirements of any Obligor (in addition to those set forth in Exhibit II of the Agreement) in response to Lenders' interpretation of, or implementation of precautionary measures relative to: (a) the introduction or adoption of, or any change in or in the interpretation, promulgation, implementation or administration of, (i) any Legal Requirements (as defined below) or any applicable law, or (ii) any governmental or quasi-governmental rule, regulation, policy, guideline, interpretation or directive (whether or not having the force of law); (b) compliance by Lenders with any guideline or request from any Governmental Authority (as defined below) (whether or not having the force of law), including any request, rule, guideline or directive (i) in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated by any United States financial regulatory authorities. "Legal Requirements" means any law, ordinance, order, rule or regulation of a Governmental Authority. "Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

10.    **Ratifications**. Except as expressly modified and superseded by this Amendment, the Loan Documents are ratified and confirmed and continue in full force and effect. The terms, conditions and provisions of the Loan Documents (as the same may have been amended, modified or restated from time to time) are incorporated herein by reference, the same as if stated verbatim herein. The Loan Documents, as modified by this Amendment, continue to be legal, valid, binding and enforceable in accordance with their respective terms. Without limiting the generality of the foregoing, each Obligor hereby ratifies and confirms that all liens heretofore granted to Lenders were intended to and do continue to secure the full payment and performance of the Indebtedness. Each Obligor agrees to perform such acts and duly authorize, execute, acknowledge, deliver, file and record such additional assignments, security agreements, modifications or agreements to any of the foregoing, and such other agreements, documents and

instruments as Lenders may reasonably request in order to perfect and protect the liens and preserve and protect the rights of Lenders.

11.      **Representations, Warranties and Confirmations**.  Each Obligor hereby represents and warrants to Lenders that (a) this Amendment and the other Loan Documents that have been duly executed and delivered by any Obligor party thereto, are valid and binding upon such Obligor and are enforceable against such Obligor in accordance with their terms, except as limited by any applicable bankruptcy laws, (b) no action of, or filing with, any governmental authority is required to authorize, or is otherwise required in connection with, the execution, delivery and performance by any Obligor of this Amendment or any other Loan Document, and (c) the execution, delivery and performance by such Obligor of this Amendment and any other Loan Documents do not require the consent of any other person and do not and will not constitute a violation of any laws, agreements or understandings to which such Obligor is a party or by which such Obligor is bound.

12.      **Reaffirmation of Guaranty Agreements**.   To induce Lenders to execute this Amendment, Guarantor: (a) agrees and consents to the execution and delivery of this Amendment and the terms thereof; (b) ratifies and confirms that all guaranties and assurances granted, conveyed or otherwise provided to Lenders under the Loan Documents, including, but not limited to the **GUARANTY** are not released, diminished, impaired, reduced, or otherwise adversely affected by the Amendment; (c) confirms and agrees that the Guaranty Agreement continues to guarantee and assure the payment and performance of Indebtedness, including, without limitation, all Indebtedness of Debtor to Lenders, in accordance with their terms; (d) agrees to perform such acts and duly authorize, execute, acknowledge and deliver such additional guarantees, assurances and other documents, instruments and agreements as Lenders may reasonably deem necessary or appropriate in order to create, perfect, preserve and protect those guaranties and assurances; and (e) waives notice of acceptance of this consent and confirmation, which consent and confirmation binds Guarantor and Guarantor's successors and assigns and inures to Lenders and its successors and assigns.   The terms, conditions and provisions of the Guaranty Agreement (as the same may have been amended, modified or restated from time to time) are incorporated herein by reference, as if stated verbatim herein.

13.      **Construction of Amendment**.   Each party hereto acknowledges that it has participated in the negotiation of this Amendment and no provision, condition, term or covenant of this Amendment shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated or drafted such provisions.  Each Obligor acknowledges and agrees that such Obligor has at all times had access to an attorney in negotiations of the terms of and in the preparation and execution of this Amendment and that such Obligor has had the opportunity to review and analyze this Amendment for a sufficient period of time prior to the execution and delivery hereof.  Each Obligor further acknowledges and agrees that no representations and warranties have been made by or on behalf of Lenders, or relied upon by such Obligor pertaining to the subject matter of this Amendment other than those that are set forth in this Amendment, and that all of the terms of this Amendment were negotiated at arms-length, and this Amendment was prepared and executed without fraud, duress, undue influence or coercion of any kind exerted by any of the parties upon the others, and that the execution and delivery of this Amendment is the free and voluntary act of each Obligor.

14.      **Regulation B—Notice of Joint Intent**.  If Obligor is more than one Person, Federal Regulation B (Equal Credit Opportunity Act) requires Lenders to obtain evidence of each Obligor's intention to apply for joint credit.  Each Obligor's signature below shall evidence such intent.  Each Obligor's intent shall apply to future related extensions of joint credit and joint guaranty.

15.      **Multiple Counterparts**.   This Amendment may be executed in a number of identical separate counterparts, each of which for all purposes is to be deemed an original, but all of which shall constitute, collectively, one agreement.  Signature pages to this Amendment may be detached from multiple separate counterparts and attached to the same document and a telecopy or other facsimile of any such executed signature page shall be valid as an original.

16.      **Reference to Loan Documents**.   Each of the Loan Documents, including the Agreement and Note and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof containing a reference to the Agreement shall mean and refer to the Agreement and Note as amended hereby.

17. **Severability**. Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

18. **Headings**. The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

19. **No Pending Bankruptcies and Waiver**. No action or proceeding, including, without limitation, a voluntary or involuntary petition for bankruptcy under any chapter of the Bankruptcy Code, has been instituted by or against any Obligor.   Upon any filing of bankruptcy, Lenders shall be entitled to immediate termination of the automatic stay provisions of 11 U.S.C. §362, granting Lenders complete relief in allowing Lenders to exercise all of its legal rights and remedies, including without limitation, the right to foreclose the lien created in the Loan Documents, judicially or nonjudicially, or any other right or remedy afforded under the Loan Documents, at law, in equity or otherwise, and agree not to directly or indirectly oppose or otherwise defend against Lenders' efforts to gain relief from the automatic stay or to foreclose the collateral securing the Indebtedness.  Lenders shall be entitled as aforesaid to the lifting of the automatic stay without the necessity of an evidentiary hearing, without the necessity or requirement of Lenders to establish or prove the value of the collateral securing the Indebtedness, or the necessity to prove the lack of adequate protection of Lenders' interest in the collateral securing the Indebtedness. In no event will any Obligor contest the validity, perfection or priority of Lenders' liens in the Collateral securing the indebtedness and obligations set forth in the Loan Documents.

20. **Release**. As a material inducement to Lenders to enter into this Amendment, each Obligor hereby fully, finally, and absolutely and forever releases and discharges Lenders and its present and former directors, shareholders, officers, employees, agents, representatives, successors and assigns, and their separate and respective heirs, personal representatives, successors and assigns, from any and all actions, causes of action, claims, debts, damages, demands, liabilities, obligations, and suits, of whatever kind or nature, in law or equity of such Obligor, whether now known or unknown to such Obligor, and whether contingent or matured (a) in connection with any and all obligations owed or owing to the Lenders under or in respect of the Agreement, the Loan Documents, or the actions or omissions of Lenders in respect of the Agreement and the Loan Documents; and (b) arising from events occurring prior to the Amendment Effective Date.

---

## NOTICE OF FINAL AGREEMENT

THE AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS AMENDED BY THIS AMENDMENT REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN AND AMONG THE PARTIES.

---

*SIGNATURE PAGE TO FOLLOW*

**IN WITNESS WHEREOF,** the parties have caused this Amendment to be effective and duly executed as of the Amendment Effective Date.

| | |
|---|---|
| *LENDER:* | *ADDRESS:* |

PRIMALEND CAPITAL PARTNERS, LP,                    3460 Lotus Drive, Suite 100
a Texas limited partnership                                      Plano, TX 75075

By:    LNCMJ MANAGEMENT, LLC,
        a Texas limited liability company
        its General Partner


        By:    _____
        Name:  Mark A. Jensen
        Title:    Manager


| | |
|---|---|
| *DEBTOR:* | *ADDRESS:* |

OHA PAPI, LLC,                                                      11700 Garland Road
a Texas limited liability company                           Dallas, Texas 75218

By:
Name:  Kathryn A. Gruner
Title:    Manager


| | |
|---|---|
| *GUARANTOR:* | *ADDRESS:* |

                                        5905 Steuben Court
KATHRYN A. GRUNER                                            Dallas, Texas 75248

**EXHIBIT II
TO
LOAN AND SECURITY AGREEMENT**

**SPECIFIC TERMS AND CONDITIONS**

1.  Maximum Advance on Sales Contracts (Section 1—"Advance Rate" definition): **Prior to AUGUST 15, 2024, the Advance Rate shall be an amount equal to the principal balance of Debtor's aggregate Qualified Collateral, excluding the Purchased Portfolio, based on data derived from Debtor's DMS which is subject to Lender verification, multiplied by 60.0%; provided that Debtor has on average at least 60.0% 12-month Cost In Deal and a 70.0% 12-month Collateral Recovery Rate average as determined by Debtor's most recent portfolio performance.  If these conditions are not met, as determined by Lender, Lender may adjust the Advance Rate accordingly.**

    **From and after AUGUST 15, 2024, the Advance Rate shall be the lesser of: (i) an amount equal to the principal balance of Debtor's aggregate Qualified Collateral, excluding Sales Contracts which are a part of the Purchased Portfolio, multiplied by 60.0%; (ii) the trailing 12 month average of Debtor's Cost in Deal; and (iii) the trailing 12-month Collateral Recovery Rate minus an additional TEN PERCENT (10.00%).**

    **The Advance Rate with respect to the Purchased Portfolio: Notwithstanding any other provision in this Agreement or in any other Loan Documents, the Advance Rate applicable to the Purchased Portfolio shall be an amount equal to the sum of the principal balance of the Purchased Portfolio, based on data derived from Debtor's DMS which is subject to Lender verification, multiplied by 70.0%. This Advance Rate for the Purchased Portfolio shall remain in effect until otherwise modified by a written amendment to this Agreement.**

    "Cost In Deal" is a percentage calculated monthly by Lender from documented item's input in Debtor's DMS. It means Debtor's aggregate vehicle costs of Pledged Accounts which is the (a) sum of: (i) the total purchase price or re-stock value of each motor vehicle; plus (ii) transportation and auction fees for vehicles purchased from non-related third parties; plus (iii) any Documented Reconditioning Costs, (b) divided by the aggregate amount financed in the month the vehicle is financed. For example, the Cost In Deal on a single vehicle would be 50% if the purchase price of such vehicle is $4,000.00, the Documented Reconditioning Costs are $1,000.00, and the amount financed is $10,000.00. Lender reserves the right to audit the items in Debtor's DMS and change and/or exclude any items from the calculation of Cash In Deal that are not fully supported.

    "Collateral Recovery Rate" is a monthly percentage calculated by Lender from data in Debtor's DMS.  It means (a) the sum of the principal payments collected from all Pledged Accounts in a calendar month, plus the amount of recoveries: (i) on Pledged Accounts from vehicle repossessed; (ii) on Pledged Accounts from insurance recoveries owing to an insurance loss; or (iii) recoveries from any other Pledged Accounts that were charged off, in that same month (the Agreement specifies how Repossessed Vehicles are to be valued), (b) divided by the total principal payments collected on Pledged Accounts (excluding note sales) in the same calendar month, plus the total principal balance of Pledged Accounts where the: (i) vehicle has been repossessed; (ii) vehicle is an insurance loss; or (iii) Pledged Accounts were charged off for some other reason, in that same month. For example, the Collateral Recovery Rate would be **60%** if the principal collected in a month was **$2,000.00**, the amount of recoveries was **$1,000.00**, and the amount of principle repossessed, lost to insufficient insurance, or charged off during this month was **$3,000.00**. Mathematically ($2,000 + $1,000) / ($2,000 +

$3,000) = 60%. The Collateral Recovery Rate is a percentage calculated by Lender from documented items input in Debtor's DMS. Lender reserves the right to audit the items in Debtor's DMS and change and/or exclude any items from the calculation of Collateral Recovery Rate that are not fully supported.

"Documented Reconditioning Costs" is an amount calculated by Lender from data in Debtor's DMS. It means Debtor's direct out-of-pocket costs of bringing a vehicle into retail sales ready condition. Documented Reconditioning Costs include: (i) the actual Dollar amount spent by Debtor on parts and shop supplies that are used on a specific vehicle; (ii) direct labor to install those parts (direct labor does not include any mark-up on the labor costs paid by Debtor); (iii) the actual direct costs of any GPS and/or the starter interrupt device; and (iv) the costs of painting and detailing the vehicle. Documented Reconditioning Costs do not include any overhead expenses.

2. Exceptions to Collateral Pledged (Section 1—"Collateral" definition): **None**

3. Dealer Management System (Section 1—"DMS" definition): **Deal Pack, on a web hosted basis, on terms and conditions acceptable to Lender in its sole discretion. Among other usages, Debtor shall fully employ the DMS to record all necessary data to support the development of accurate financial results according to Generally Accepted Accounting Principles (GAAP). This shall include the costs to purchase each vehicle, as well as the Documented Reconditioning Costs for each vehicle (including GPS, transportation, etc.). Lender shall require a sample of proof of cost each month for items including: (a) the acquisition cost, (b) Repossessions restocked at mileage adjusted NADA average trade value without option adjustments, and (c) actual recondition expenses at cost, none of which may include overhead (PACK). Lender must agree to any changes to this criterion in writing in advance.**

4. Maximum Amount (Section 1—"Maximum Amount" definition): **$37,500,000.00**

5. Payment Account (approved bank) (Section 1—"Payment Account" definition): **Debtor shall deposit individual retail customer payments on Pledged Accounts directly into the designated Payment Account** (ACH, cash, checks, debit card, credit card or money orders). This account shall be held in Debtor's name at CIBC Bank USA subject to a blocked account agreement. Payments on Lender's Pledged Accounts shall be identified and separated in Debtor's DMS. Debtor will aggregate and deposit cash payments on a daily basis. Beginning on the day the contract is funded, Debtor shall wire or Lender shall ACH daily retail payments from Debtor's operating account each day until Debtor has established and begins using said Payment Account. **If Lender is Debtor's inventory lender, then all funds received on cash sales of inventory (including retail, wholesale, auction, and third-party finance sales) shall be deposited into this Payment Account.**

6. Exceptions to Qualified Collateral Criteria (Section 1—"Qualified Collateral" definition): **The determination of which Exhibit I requirements are applicable to the Purchase Portfolio shall be made at Lender's sole discretion.**

7. Maturity Date (Section 2(a)): **MAY 31, 2025**

8. Initial Loan Amount (Section 2(b)): **Up to the Maximum Amount as long as supported by sufficient Qualified Collateral.**

9. Effective Date Origination Fee (Section 2(f)(i)): **$5,000.00.** This fee has already been paid in full by the Debtor.

10. Collateral Processing Fee (Section 2(f)(ii)): A **$50.00** collateral processing fee will be paid to Lender for each Sales Contract submitted into the base of pledged collateral. **No collateral processing fee is due for any Sales Contract submitted to Lender within one (1) week of the Effective Date.**

LOAN AND SECURITY AGREEMENT – EXHIBIT II
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

11. Unused Line Fee (Section 2(f)(iii)): **0.00% per annum fee on the unused portion of Maximum Amount (as calculated daily).**

12. Amendment Fee (Section 2(f)(iv)): **$1,200.00**

13. Termination Fee (Prepayment) (Section 2(g)): **None**

14. Advances Against Real Property (Section 2(h)): **None**

15. Ancillary Loans to Debtor (Section 2(h)): **None**

16. Adverse Conditions (Section 6(f)): **None**

17. Exceptions to Negative Covenant—Liens or Sale of Assets ("Permitted Liens" definition and Section 8(b)): **None**

18. Exceptions to Negative Covenant—Debt (Section 8(c)): **None**

19. Exceptions to Negative Covenant—Loans (Section 8(d)): **None**

20. Exceptions to Negative Covenant--Dividends or Distributions (Section 8(f)): **Allowed in the normal course of business as long as such dividends and distributions do not result in any default or prospective default under the provisions of this Agreement.**

21. Financial Metrics (Section 9): **All financial reporting shall reflect Debtor taking a loss reserve or purchase price discount of no less than the greater of (a) 30% or (b) the actual percentage of write offs in the note portfolio as reflected by the Loss to Liquidation Ratio calculated by Lender in the portfolio. Lender reserves the right to require loss reserve adjustments in its sole discretion.**

   "Loss to Liquidation Ratio" means the sum of the charge offs from all Pledged Accounts in a calendar month, minus the amount of recoveries on Pledged Accounts where: (i) the vehicle has been repossessed; (ii) the vehicle is an insurance loss; or (iii) the Sales or Lease Contract was charged off for some other reason, in that same month (the Agreement specifies how Repossessed Vehicles are to be valued), divided by the total principal payments collected on Sales or Lease Contracts (excluding note sales) in the same calendar month, plus the total principal balance of Sales or Lease Contracts where: (i) the vehicle has been repossessed; (ii) the vehicle is an insurance loss; or (iii) the Sales or Lease Contract was charged off for some other reason, in that same month. For example, the Loss to Liquidation Ratio would be **40%** if the principal collected in a month was **$2,000.00**, the amount of recoveries was **$1,000.00**, and the amount of principle repossessed, lost to insufficient insurance, or charged off during this month was **$3,000.00**. Mathematically ($3,000 - $1,000) / ($2,000 + $3,000) = 40%. The Loss to Liquidation Ratio is a percentage calculated by Lender from documented items input in Debtor's DMS. Lender reserves the right to audit the items in Debtor's DMS and change and/or exclude any items that are not fully supported.

22. Reporting Procedures (Section 10):

   (a) **Monthly Reports**. Monthly financial results (consolidated balance sheet and income statement), prepared internally by Debtor in accordance with GAAP, within **30** days of close of each month.

   (b) **DMS Payment Reconciliation Report**. A DMS Payment Reconciliation Report within **15** days of the close of each month, prepared internally by Debtor in accordance with GAAP, within **30** days of close of each month.

   (c) **Annual Consolidated Financial Statements**. Within **120** days after each fiscal year end, annual

LOAN AND SECURITY AGREEMENT – EXHIBIT II
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

consolidated financial statements of Debtor, **audited** by a certified public accountant reasonably acceptable to Lender and shall not be subject to any qualifications.

(d)   **Annual Tax Returns**. Annual tax returns for Debtor and all Guarantors within **10** days of filing.

(e)   **IRS Forms**. IRS Forms 941 and 940, and accompanying proof of employment tax payments, within **10** days of the end of each quarter;

(f)   **Personal Financial Statements**. A personal financial statement for all owners and Guarantors not less often than annually or upon renewal of this Agreement;

(g)   **Compliance Certificate**. The certificate shall be submitted electronically or otherwise by Debtor to Lender monthly along with its monthly financial statements; and

(h)   **Repossession Report**. Within 5 days of the close of each month, Debtor shall provide to Lender a report of vehicle repossessions for such month (including both the number and principal amount) and mark-up (sales price divided by ACV including reconditioning costs to make the vehicle ready for sale) for such month. Such repossession and mark-up report may be delivered by means of Debtor's DMS if and only if such reporting is satisfactory to Lender in Lender's sole discretion.

23.   Cross Collateralization and Cross-Default (Section 15): All Debt of Obligors to Lender and/or Lender's Affiliates.

24.   Origination Expense Prepayment Amount (Section 25): **Paid pursuant to separate agreement between Debtor and Lender.**

25.   Other Requirements:

(a)   Dealer Management System Data Accuracy and Accessibility; GPS.

(i)   Debtor shall maintain records of and accurately enter into Debtor's DMS, among other things, the purchase price for each item of Qualified Collateral, all Documented Reconditioning Costs, and accurate valuation information for all Repossessed Vehicles. Lender has the right at any time to request, audit and verify documents supporting any purchase price, Documented Reconditioning Costs and/or Debtor's valuation of any Repossessed Vehicle, and to exclude any Documented Reconditioning Costs or otherwise modify the Borrowing Base if the purchase price, Documented Reconditioning Costs or valuations are not being properly documented.

(ii)   Debtor shall subscribe to and make available to Lender, at Debtor's expense, such data files and feeds from Debtor's DMS that provide Lender with online accessibility to digitally manipulatable data that is compatible with Microsoft Office Excel and other digital data analysis systems and tools. In the event that Lender, in its sole discretion, is not satisfied with the form or content of the information/data provided through Debtor's DMS, Debtor will cause its DMS provider to modify the form and content of such information/data as directed by Lender.

(iii)   Debtor must enter into tri-party agreements with Lender and Debtor's DMS provider and GPS provider, which allow Lender unrestricted access to Debtor's DMS and GPS for as long as Debtor has any outstanding obligations to Lender. Debtor will cause its DMS provider and GPS provider to provide Lender with any and all information contained in Debtor's DMS and GPS as requested by Lender, including, without limitation, a breakdown of the principal and interest Debtor receives from its DMS provider. Debtor must make all reasonable effort to get the DMS and GPS vendors to sign the tri-party agreements.

(b)   Obligors will not, without Lender's prior written consent, directly or indirectly issue, transfer, sell

LOAN AND SECURITY AGREEMENT – EXHIBIT II
PRIMALEND CAPITAL PARTNERS, LP – OHA PAPI, LLC

or otherwise dispose of, or part with control of, or permit the transfer of, any equity interests in Debtor, other than transfers to Lender.

(c)     Debtor's business practices and all Qualified Collateral shall be compliant with State and Federal laws governing Debtor's business, including, within limitation CFPB regulations.

(d)     Debtor shall take corrective action on suggestions made by the Phoenix Business Consulting, LLC compliance expert, as outlined in the October 20, 2023 Compliance Audit Summary, within 30 days from the Effective Date to correct non-compliant issues identified in such review to the satisfaction of Lender in its sole and absolute discretion.

(e)     When Debtor sells a vehicle that has an outstanding debt on any floor plan or other related debt for a Sales or Lease Contract that will be pledged to Lender, Debtor agrees to notify Lender and request Lender to directly pay the outstanding debt to Debtor's third-party floor plan lender.

(f)     Debtor's financial books and records shall:  (i) include and record as assets all costs to purchase and make vehicles ready for sale including purchase price, reconditioning parts and direct labor (direct labor only includes the actual cost of labor and does not include a profit margin), GPS and transportation and auction fees; (ii) track charge offs by amount and type; and (iii) record recoveries on Repossessed Vehicles at NADA, mileage adjusted average trade-in value or the actual cash proceeds if the vehicle is sold for cash or at auction.

(g)     Debtor shall collect all accounts in compliance with Debtor's collection policy, which have been provided to Lender, or any revised collection policies that are subsequently adopted and approved Lender. Furthermore, Debtor must send Lender a copy of Debtor's underwriting guidelines and its policies and procedures for when delinquent accounts will be charged-off and how and when vehicles will be repossessed.  Debtor must follow these guidelines, policies and procedures and Lender must approve any changes to the guidelines, policies and procedures.

(h)     Debtor will scan a copy of each Sales or Lease Contract, motor vehicle title and the underlying loan documents (deal jackets) and upload each PDF image to the PrimaLend Portal, which may be accessed by logging in at https://portal.primalend.com/ using the username and password credentials created and assigned to Debtor by Lender.